# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DISTRICT

-------------------------------------------------------------x
                                                             :
In re:                                                       :
                                                             :  Chapter 11
Uwagboe O. Oru-Lawerence,                                    :  Case No. 13-17250 (MSH)
                                                             :
          Debtor.                                            :
                                                             :
-------------------------------------------------------------x

## NOTICE OF FILING OF DECLARATION IN SUPPORT OF REQUEST OF CERTAIN TENANTS FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES PURSUANT TO 11 U.S.C. §503(b)

On August 26, 2016, tenants ("Tenants")[1] of certain residential real property owned by the debtor, Uwagaboe O. Oru Lawrence a/k/a Uwa Lawrence, Uwa Oru-Lawrence, Uwagboe Orumwense Lawrence, Uwagboe Oru-Lawrence (the "Debtor"), which residential real property is property of the Debtor's bankruptcy estate, filed the *Request of Tenants for Allowance and Payment of Administrative Expenses Pursuant to 11 U.S.C. §503(b)* [Dkt. No. 205] (as supplemented by the Supplement to Request for Payment, the "Request for Payment").

In support of the Request for Payment, Tenants hereby file the *Declaration of John Carroll, Esq.*, attached hereto as **Exhibit 1**.

Dated: New York, New York
       September 30, 2016

Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

By: */s/ Christopher R. Mirick*
Andrew M. Troop
Christopher R. Mirick
1540 Broadway
New York, NY 10036
(212) 858-1000 (Phone)
(212) 858-1500 (Fax)
andrew.troop@pillsburylaw.com
christopher.mirick@pillsburylaw.com

---

[1] The term "Tenants" includes tenant John Conlin, as identified in the *Supplement to the Request of Tenants for Allowance and Payment of Administrative Expenses Pursuant to 11 U.S.C. §503(b)*, dated September 10, 2016 [Dkt. No. 228] (the "Supplement to Request for Payment").

## **Exhibit 1**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

---------------------------------------------------------------- x

In re:

Uwagboe O. Oru-Lawrence,

      Debtor.

: Chapter 11
: Case No. 13-17250-MSH

---------------------------------------------------------------- x

## DECLARATION OF JOHN CARROLL, ESQ.

I, John Carroll, state the following under pains and penalties of perjury:

1.     My name is John Carroll.  I am an attorney, in good standing, licensed to practice law in Massachusetts.  I am currently a partner and trial lawyer at Meehan, Boyle, Black & Bogdanow, P.C., a trial firm in Boston.

2.     For most of the 42 years I have practiced law, I have represented plaintiffs in personal injury cases.  I would estimate that I have tried approximately 50-100 personal injury cases over the course of my career.

3.     On many occasions, I have filed claims based on intentional, reckless, and/or negligent infliction of emotional distress.  Further, as part of my practice I follow settlement and verdict values of these types of claims, either by observing similar cases in court, having conversations with fellow attorneys who regularly litigate such claims, and reading settlement and verdict reports in various media.

4.     I have reviewed various filings submitted by the consortium of tenants residing at 91-101 Waldeck Street, Dorchester MA 02124, and 25-35 Orlando Street, Mattapan MA 02126 (hereinafter the "Tenants") in the Chapter 11 Bankruptcy case *In re Uwagboe O. Oru-Lawrence*, Case No. 13-17250-MSH.  I have also reviewed Supplemental Affidavits

from a representative cross-section of the Tenants provided to me by their counsel, which

attest in detail to the physical and emotional distress they suffered as a result of

intentional, knowing, reckless, and/or negligent acts and omissions of their landlord, Uwa

Lawrence (hereinafter "Debtor"), who is also the Debtor in the above-mentioned Chapter

11 case.  The Supplemental Affidavits I reviewed are attached to this Declaration as

Exhibits 1–14.

5.    I also reviewed the Supplemental Affidavit of David Thomas, the Director of Permanent

Housing and Clinical Services (the "Program") for the Homeless Services Bureau of the

Boston Public Health Commission (BPHC) and a licensed clinical social worker.  I

understand that BPHC has also filed a Request for Payment of Administrative Expenses

in the above-mentioned Chapter 11 Bankruptcy case as tenants of the Debtor at multiple

units located in the Waldeck and Orlando Street buildings.  Mr. Thomas's affidavit both

detailed the critical importance of the Waldeck and Orlando Street properties to the

BPHC's housing program, which places chronically homeless or mentally ill adults into

stable living environments, and described the physical and emotional distress suffered by

one of the program's participants as a result of the Debtor's intentional, knowing,

reckless, and/or negligent acts and omissions.  A copy of Mr. Thomas's Affidavit is

attached to this declaration as Exhibit 15.

6.    In Massachusetts, it is well-settled that damages for emotional distress are recoverable in

the landlord-tenant context, either as a common-law claim for intentional or reckless

infliction of emotional distress, see, e.g., Simon v. Solomon, 385 Mass. 91, 95 (1982), or

as consequential damages recoverable under the quiet enjoyment statute, G.L. c. 186, §

14, see Homesavers Council of Greenfield Gardens, Inc. v. Sanchez, 70 Mass. App. Ct.

453, 501–02 (2007), and/or under the Consumer Protection Act, G.L. c. 93A, see Haddad

2

v. Gonzalez, 410 Mass. 855, 866–67 (1991).  Importantly, where emotional distress

damages are claimed as part of a statutory cause of action for interference with quiet

enjoyment, the plaintiff need only show that his emotional distress was a "foreseeable

consequence" of the acts or omissions giving rise to the violation in order to recover.

Homesavers Council, 70 Mass. App. at 501.  That is, emotional distress is recoverable

under G.L. c. 186, § 14 even where the landlord caused such distress negligently, rather

than intentionally or recklessly.  Id. at 502.

7.    After reviewing the materials provided to me by the Tenants' counsel and the BPHC, and

in consideration of the legal context described above, my opinion is that the Tenants

would have an overwhelming probability of recovering money damages for emotional

distress in the event they took their various claims to trial.

8.    The amount of such damages that could be recovered in each case is harder to assess, but

a certain range can be estimated to a reasonable degree of professional certainty based

upon my knowledge and experience.  I will state, however, that I have reviewed the

Tenants' original filing in the Bankruptcy Court and examined the damages calculations

prepared by counsel—which included estimates ranging from $5,000 to $20,000 in

emotional distress damages for a small number of the tenants—and found it to be quite

conservative, at least as to emotional distress.

9.    The range of values a jury may award in these cases, on a bell curve of probabilities, in

my opinion, would be approximately $50,000- $150,000 in damages for each of the

Tenants, with a peak of the bell curve being in the vicinity of high 5 figures or low 6

figures, excluding attorney's fees.

Signed under the pains and penalties of perjury this 28th day of September , 2016,

_John Carroll_____

[Print/type name here; sign above line]

John Carroll

4

# Exhibit 1

## SUPPLEMENTAL AFFIDAVIT OF CAROLYN LEWIS

I, CAROLYN LEWIS, hereby attest to the following:

1.    I am 64 years old, African-American, disabled and live alone on a fixed income from disability benefits.  As the youngest of 5 siblings, my family support system consists of my adult niece.

2.    From March 2010 to June 2016, I was a tenant with a Section 8 voucher at 101 Waldeck Street, Unit 2R, Dorchester, 02124 ("Apartment").  My landlord was Uwa Lawrence, also known as Uwagaboe Lawrence or Uwagaboe O. Oru-Lawrence.

3.    I currently live at 35 Eldon Street, Dorchester, MA, 02121.

4.    I am one of the few tenants of Mr. Lawrence who has been able to find alternative housing and escape the deplorable housing conditions at the Waldeck Street properties owned by Mr. Lawrence (collectively, "Waldeck Properties" or "Premises").

5.    My six years of living as a tenant of Mr. Lawrence can only be characterized as a constant, taxing, stressful struggle with Mr. Lawrence, trying in vain to get him to respond to my pleas to fix the never-ending series of problems that plagued my Apartment and interfered with my ability to take care of my declining health.

6.    For sure, the never-ending struggle with Mr. Lawrence contributed significantly to the deterioration of my overall health, exacerbated my high blood pressure, led to my sleep problems for which I had to be prescribed medication, and contributed to the heart attack I suffered, which in turn prevented me from being able to get the hip replacement surgery I needed badly and was scheduled to get.

7.    Like many other tenants targeted by Mr. Lawrence, I moved into 101 Waldeck #2R as I was running out of time to find an apartment with my Section 8.  So I took the Apartment

even though it was still in the midst of—as I learned later—illegally subdivisions made

without permits and by unlicensed and untrained workers, into two one-bedroom units

from a single three bedroom apartment. And I stayed because I had no choice to move to

a safe and habitable place that was affordable and accessible to public transportation and

the hospitals because I have limited mobility due to a back disability.

8.      Even after I moved in, for more than six months, workers entered and left my apartment

at all times of the day, ripped down the double ceiling to expose me to unidentified dust

that came down and covered everything, tore down and erected walls creating debris

everywhere, demolished and moved the bathroom to a different location where there was

no vent, ripped up the floors, and put up additional poorly cut doors that left large gaps.

They never cleaned up the mess they created. Progress was excruciatingly slow because

the work crew would often stop working – perhaps to move to subdivide other units

depending on what materials they got to work with, or not having gotten paid, stop

working.

9.      And then, I also had to endure the debris and health hazards from the unpermitted work

being done to create (from the three rooms that were cut out of my Apartment) a new

apartment in front of mine.  I had no choice but to walk through this mess every day to

get to my Apartment, worried I might step on a rusty nail or trip with my cane.

Meanwhile, the workers performing the subdivision were living there, and it was

extremely embarrassing and uncomfortable that Mr. Lawrence put me in the position of

having to observe these men's private lives.  At some point, he told them to start closing

the door to the rooms so I could walk through to my Apartment with less discomfort.

10.     I got very sick as a result of the work that was going on—not only in my Apartment but

the front apartment I had to walk through every day.  A blood-like stain appeared under

2

my finger nails and persisted for about three months, for which I was observed by the

hospital. One concern was that there might have been rat poison in the dust from the

ceiling and walls that were demolished. My overall health got poorer and I couldn't

sleep. I was breathing in various fumes and dust.

11.  Needless to say, I was being deprived not only of the rest and sleep I needed, but I got no

enjoyment from my Apartment. Mr. Lawrence never put me in a hotel or offered to do

so. Instead, he attacked me verbally when I requested even something as basic as a full

size replacement for the ancient green box refrigerator with rust and mold that came with

the Apartment. One day, Mr. Lawrence was personally in my Apartment to oversee

some work, so I took the opportunity to ask him again for a replacement refrigerator. In

response, he launched into a denigrating attack on me and my disability and my source of

income. He yelled that I should not be asking anything more from him and instead

should be grateful to him because without people like him, there would be no income to

support people like me. I was very humiliated. I had been a security dispatcher before an

injury to my spinal area made me permanently disabled.

12.  Another time when I asserted myself by questioning the credentials of his workers, and

tried to refuse to let them into my Apartment until they showed me that they were

authorized to do the work that was going on, Mr. Lawrence was furious and personally

threatened me that I should never again question his workers or refuse to let them in to

my Apartment whenever they came.

13.  Even well after the shoddy construction of my Apartment and the one in front was

completed, and until the very day I moved out, I suffered on-going bad conditions that

Mr. Lawrence intentionally and willfully refused to address, including a disgusting

infestation of mice; leaks that caused, among other problems, mold and the collapse of a

3

part of the bathroom ceiling the size of the circumference of a barrel just moments after I

used the bathroom; a defective old heating system that was wholly controlled by Mr.

Lawrence  from the basement he kept locked, which had two settings –unbearably

roasting hot throughout the entire building, or no heat even in the iciest cold winter

nights; unreliable and insufficient hot water service, which was periodically terminated;

unsafe electrical wiring; broken walls that were repeatedly just patched over; old floors in

need of replacement; incorrectly cut doors that hung poorly, leaving large gaps; a bathtub

that dripped constantly in a bathroom with no vents; unprofessionally laid tiling that

broke off constantly, throwing off chunks of cement that were painful to step on; a major

debris buildup, composed mostly of construction materials, cast off old furniture of

former tenants who had left or been evicted, flammable gasoline containers, and

discarded appliances and the like, in the yard as well as basement, all of which were

wholly ignored and left to harbor rodents; filthy common areas; blocked exits that posed

a major safety hazards given there were no operable smoke detectors; and dangerous and

slippery sidewalks in the winter that were never cleared and sharp heavy icicles that hung

all along the building threatening to crack onto someone because there was no proper

drainage around the roof.  The debris in the basement and yard was not only an eyesore,

but also created an atmosphere which invited vagrants and rodents, gave rise to a bad

odor that wafted into my apartment, and otherwise made me worry for my physical safety

and health.

14.    Apart from the large rats near and in the plastic garbage bins which I feared, and forced

me to pay neighbors a dollar or two to throw out my garbage for me, one of the

chronically disturbing problem was also the mice infestation in my Apartment that was

impossible to eradicate because Mr. Lawrence never treated the entire building.  The

4

constant struggle with the mice exhausted me, made me feel helpless, frustrated and depressed, and seriously interfered with the use of my Apartment every day. Mice were everywhere. Particularly disturbing were the dead ones in the floor spaces and walls. The stench during the period they rotted was unspeakable. For example, once something died in the bathroom. Even with a rag firmly against my nose and mouth, the smell was nauseating. When I begged Mr. Lawrence to find the dead thing because I couldn't use the bathroom, he shrugged me off and told me to deal with it because it would eventually desiccate. I almost fainted when one day as I was about to enter the shower, I saw a group of maggots squirming on the tub – I can only fathom they were from a nearby dead mouse. It is traumatic to be startled by mice running within and around one's stove, cabinets, floor… everywhere. I was made hypervigilant. I could keep my perishables only in the top cabinets which was hard for me with my arthritis, back and mobility issues. On several occasions, I had to pay a neighbor to remove a dead mouse in the Apartment. I am by nature a tidy person who likes to keep an orderly and clean house. The rodent and mice infestation caused me daily, chronic anxiety and stress, seriously interfered with sleep and rest, and ate into valuable time I should have been able to direct to other important concerns in my life, such as some major medical issues I was facing.

15.    Another chronic issue during the winters was the defective heating system that affected the whole building. The control for the heat was in the basement which Mr. Lawrence kept locked and wholly controlled. Even when it was very cold, Mr. Lawrence often would not turn the heat on. And when after many requests from many tenants, he did turn it on, it would rise to an unbearable roasting temperature, requiring the tenants to open their windows since they could not otherwise regulate the temperature. When the tenants asked for heating system to be fixed, Mr. Lawrence couldn't be bothered so he

would just tell us to open the windows.  But then when he was around the buildings and

saw the windows open, he would get furious and yell that the windows be closed because

tenants were wasting heat, and then he would turn the heat off.  It was a vicious cycle of

either roasting hot or being ice cold – and in either situation, the stress of constantly

having to try to get Mr. Lawrence to turn the heat on—forget about fixing the heating

system—was exhausting and frustrating, aggravated my high blood pressure, and daily

interfered with use and enjoyment of my Apartment.

16.    Mr. Lawrence has absolutely no respect for the rights of his tenants and willfully ignores

his obligations as a landlord.  When I had been calling Mr. Lawrence for days without a

response and occasionally manage to catch him outside the building, I would call out,

"Lawrence, Lawrence…" to get his attention and he would ignore me completely, or

would angrily yell back, "Mrs. Lewis, why are you yelling my name," and walk away.

Sometimes, when he did respond to repeated calls and say he would send someone, it was

stressful to wait around and around and around wondering if and when someone was

actually coming.  For example, when the ceiling fell in my bathroom from a leak

somewhere above my Apartment, I had to clean the debris myself because no one came

from Mr. Lawrence.  I had to pay a neighbor to put up a trash bag to cover the big hole in

the ceiling so I did not have to look into it and worry about all the rodents living up there

that might attack me while I was in the bathroom.  It was very distressing, humiliating,

and depressing to be so entirely ignored and to be made to feel like one had no rights as a

tenant.

17.    Another incidence was when Mr. Lawrence put six (6) people into the one bedroom

apartment right above mine, including two very loud and jumpy children and some very

heavy-footed adults, and this further interfered with my ability to sleep, my health and

6

enjoy my Apartment, I complained to Mr. Lawrence. His threatening response was to tell

me that I should be the one that was evicted, and that I should never again question or

challenge who he put in where.

18.   Indeed, the worst effect on my emotional health was the knowledge that Mr. Lawrence

retaliated with evictions when tenants stood up to him, or when the housing authorities

demanded he make repairs or risk losing the subsidy payment. He simply evicted, and in

the very tight Boston rental market, readily found another desperate person or family

willing to accept the substandard housing he offered.

19.   Sometime around December, 2015, Boston Housing Authority ("BHA") which

administers my Section 8 voucher, as well as the Section 8 voucher of many other tenants

of Mr. Lawrence in his Waldeck Street buildings, stopped their HAP subsidy payments to

Mr. Lawrence, due to his intentional refusal to make repairs that had been previously

cited despite repeated opportunities to do so. As a result of the termination of HAP

payments, I was instructed by BHA to find another apartment to move to within four

months, or risk losing my Section 8 voucher. This is because as I understand it, the HUD

rule is that if a subsidy HAP payment is not made to any landlord for a period of 6

months, the Section 8 voucher tenant, through no fault of her own, will lose her voucher.

20.   Given shortage of rental units and the prohibitively high rents all across the greater

Boston area, I had endured for years the horrible living conditions in my Apartment as

Mr. Lawrence's tenant, notwithstanding that I suffered numerous serious health problems

as a result, manifested by nausea, skin irritation, high blood pressure, and eventually,

even a heart attack. But now with my Section 8 voucher at risk, I was intensely terrified

that I would not find another apartment in time, would lose my voucher and become

homeless. At my age and with my disabilities, homelessness was not an option because I

7

could not even get State emergency shelter without a minor child. Without a doubt, I

knew that prioritizing finding a new place to live was even more important than my

immediate and pressing health needs, including a hip replacement surgery which I had to

postpone.

21.    Only a couple of neighbors in a similar situation of losing their Section 8 vouchers due to

Mr. Lawrence's habitual refusal to make repairs had successfully moved out with their

Section 8. But each was forced to relocate to an apartment far outside of Boston, and for

me that also was not an option. Due to my disabilities and declining health condition, I

needed to be in the Boston area, where I could get to and continue to receive care under

my regular medical providers and specialists. Because I am physically restricted in my

mobility, I enlisted the help of my very busy adult niece with a car to help me in my

intensive housing search through all channels. In light of my medical problems, BHA

granted me a final extension of 2 months to the maximum 6 months to find different

housing. I delayed my hip replacement surgery and hired a real estate agent to help me.

22.    My precarious housing situation took an even worse turn in the summer of 2016, when

Mr. Lawrence filed an eviction against me. Shortly after I received the eviction notice,

the physical and emotional stress got so bad that I suffered a heart attack, which required

the implantation of two stents as part of the treatment process. He was impatient to get

me out by eviction, even though he knew I was already desperately looking for other

housing, because his only concern was to get himself cash from a replacement tenant's

first and last month's rent and security deposit. I learned that Mr. Lawrence was in

bankruptcy proceedings, and desperate for cash, he was sending notices to quit to tenants

whose housing authorities had stopped making Section 8 HAP payments due to his own

fault in refusing to make repairs.

8

23.    From the time I moved in to the date I moved out, Mr. Lawrence showed a callous

indifference to my well-being as a tenant and disrespect for the laws he was obligated to

follow as a landlord, and has subjected me to cruel and abusive treatment.  His inhumane

and lawless conduct, including his extreme negligence with respect to the maintenance of

my Apartment as described above, made life very difficult for me and caused me to suffer

physical health problems as well as severe emotional distress for which I needed medical

attention.

**[Signature on following page]**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _____28_____ of _____September_____2016

Printed Name -- Carolyn Lewis

# Exhibit 2

## AFFIDAVIT OF MICHELLE MADOLO

I, Michelle Madolo, hereby attest to the following on behalf of myself and my children:

1.  I currently reside in a homeless shelter with my infant and 2 year old daughters. No longer scared for the safety of my children and myself, I am now able to provide this affidavit in support of my claims against my landlord, Uwagaboe Lawrence ("Mr. Lawrence").

2.  From May 2016 to September 16, 2016, I was a tenant of Uwagaboe Lawrence in one of three basement units at 95 Waldeck Street, Dorchester, Massachusetts ("Unit").

3.  The three basement units at 95 Waldeck Street include my Unit, another similar single room unit, and a separate, self-contained, and well-appointed private apartment with a private kitchen which Mr. Lawrence occupies ("Lawrence Apartment").

4.  On September 16, 2016, following the escalation of hostile treatment by Mr. Lawrence, Mr. Lawrence entered my apartment without permission while I was out with my children and ransacked it, leaving my personal belongings in shambles and my bedding in such a manner to ensure that we could not sleep or stay in our Unit any further. As a result, I was placed in an emergency homeless shelter, where I remain today. A copy of the police report for the incidence is attached as **Exhibit A**.

5.  I rented my basement Unit Beginning May 1, 2016, through the arrangement of a mutual acquaintance of Mr. Lawrence and my family friend, who represented to me that Mr. Lawrence was a wealthy gentleman of reputable standing in the Nigerian community.

6.  I was given a key and allowed to move in the Unit upon payment in cash of the first month rent of $700 and a security deposit of $700 to Mr. Lawrence. I was never given any receipt for my payment of rent or security deposit.

7.  My basement Unit is a small single room with a tiny but private water closet with a

shower, wash basin and toilet, and the use of a common kitchen which has a stove top

range, refrigerator and microwave. Mr. Lawrence has his own kitchen in his apartment

adjacent to my room.

8.      The second means of emergency egress for my Unit and for the other single-room

basement unit is through Mr. Lawrence's locked Apartment, and therefore not accessible

in the event of a fire or other emergency unless Mr. Lawrence is personally there and lets

us in to his apartment.   One day, I was alerted by another tenant of a fire in a unit

upstairs.  We were fortunate to be able to get out safely using the front basement exit.

Had the tenant not alerted us and had the fire spread to prevent escape through the front

basement door, we surely would have been burned alive, trapped and unable to escape.

9.      An inspection by the Inspectional Services Department ("ISD") on or about September 7,

2016 showed that there was no smoke detector. It still sends chills down my spine when I

think of this incident.

10.     Also, the only window in my basement Unit is at the ground level (when viewed from the

outside), and much too small for a person fit through.  In any event, my basement

window is surrounded by security bars, so it could not have been used as a second exit in

the event of a fire.  The window also could not be opened for badly needed ventilation

because of the intense and nauseating smell of stale urine that would flow into the room if

the window was opened even a crack.  With little security around the building, vagrants

had been using the recessed area outside my window to urinate into, and the long-

standing pools of urine produced a permanent stench.

11.     Another reason I couldn't open the ground-level window was because there was a terrible

rodent infestation throughout the building. My window was in a direct path to the row of

filthy old plastic garbage bins the rodents chewed through and blatantly occupied, even

2

during daylight hours. I was always fearful about opening the trash bins and would never let my daughter near them.

12. Even with the window closed, rodents could and did get into my unit through the large gap in the bottom of my door from wherever they lived throughout the basement. After my 2 year old daughter saw a rodent in our room one night, she was no longer able to fall asleep if the light was turned off. As a result, the light had to be left on all through the night, and I have not been able to get restful sleep at night, which I believe adversely affected my pregnancy. I also could not sleep soundly worrying that a rabid rodent might jump onto the bed and bite one of my children or myself while we were sleeping. I would always think about how they would frequently jump out of the garbage bins, looking ready to attack your face.

13. I did not realize the extent to how stressful this constant vigilance about rodents and having the light turned on through the night had been until I moved into the shelter and no longer had these stresses. I could finally breathe peacefully. I am sure the constant stress associated with living at Waldeck Street and having Mr. Lawrence as my landlord living right next to me in the basement was bad for my health and pregnancy.

14. On September 21, 2016, I returned to 95 Waldeck Street (accompanied by an attorney from Greater Boston Legal Services for safety) to find Mr. Lawrence in effort to retrieve an Xfinity box I had rented but that was being held by Mr. Lawrence. I needed Mr. Lawrence to return the box so that I could stop being charged by Xfinity, but Mr. Lawrence had been nonresponsive to my requests. When the lawyer and I arrived at 95 Waldeck Street, we encountered an Environmental Health Inspector from ISD speaking with several other tenants. The inspector was concerned about the rodent infestation throughout the buildings posing an environmental safety issue.

3

15.     When I first heard rumors of Mr. Lawrence's bankruptcy, I did not want to believe it was

true because I worried about what it meant for my housing. Also, there was no obvious

sign that he didn't still own and control what was happening at the properties. To the

very day I was forced out of the Waldeck Street basement, I knew that Mr. Lawrence was

going about demanding rent, showing vacant apartments to people, trying to evict people

who refused to pay him rent, and coming and going as he pleased. I know of at least one

instance where a family paid him a large amount of money for first month's rent, last

month's rent, and security deposit to move into one of the vacant units after the lawyers

confirmed that a trustee had been appointed to be in charge of the buildings.

16.     However, when I asked Mr. Lawrence about the rumors of his bankruptcy, Mr. Lawrence

simply denied everything, and just commanded me to continue to pay him the rent. I

continued to worry that I would have to pay rent twice to avoid getting evicted because

Mr. Lawrence was very personally aggressive about getting paid, and yet, if I didn't pay

the trustee, then the trustee might evict me. I began to inquire all over for somewhere

else to live. I was expecting to give birth very soon, and the insecurity about what was

happening to the building was causing me great anxiety. But I could not find any place

that would rent to me that I could afford. I felt trapped and desperate and depressed.

17.     By the time Mr. Lawrence next demanded rent, I had decided I could better protect

myself by withholding the rent from him. He got very angry and told me that I had no

rights; that no one could help me because my Unit was illegal; and that I had to deal with

him and pay him. He told me that he still controlled everything. He pointed to the

common kitchen and threatened to take everything away: "I can take that, and that and

that…" referring to the appliances he knew I needed to cook my family's meals. I

believed Mr. Lawrence, that I would get evicted for living in an illegal unit, even though

4

I had not known it was illegal, and it was Mr. Lawrence who had knowingly created and rented me an illegal unit. But I was afraid of becoming homeless, and I didn't want to draw attention to myself by sending the trustee my rent showing my basement address on it.

18.     After seeing his true colors, I was afraid to run into Mr. Lawrence, and I didn't want him getting friendly with my 2 year old daughter. He lied and intimidated me to prevent me from seeking legal help. I began to spend more and more time outside, avoiding my basement Unit because his Apartment was next to it. This was very hard to do because initially I was in the late term of my pregnancy, and then later, I had a newborn and a two year old. When my daughter and I became too tired, we crawled into the car that had been lent to us, preferring to rest in the car than return to the basement Unit. The stress of all this made it hard to adequately breastfeed my newborn because my milk supply became significantly reduced.

19.     For a few days when the weather got cool, I was relieved to use the excuse of the breezy wind to stay in our Unit with the door securely closed. Mr. Lawrence knew that I typically left the door wide open when we were home (because it was too claustrophobic otherwise), and I was worried that Mr. Lawrence would be provoked to retaliate if he sensed I was avoiding him by closing my door without an external reason, like the windy weather.

20.     Sometime in the midst of all this stress, the Department of Water and Sewer posted notices at the buildings that the water would be shut down because Mr. Lawrence had not paid his bill. Eversource also sent a similar termination notice because Mr. Lawrence had not paid his bill. One day an Eversource representative came by to shut off the electricity to the building. A neighbor who happened to see the Eversource technician ran to him

and told him that if he shut off the electricity to the common areas (which would include

my Unit and the basement appliances in the kitchen), that it would also shut off the

smoke detectors in some of the apartments because the whole building was wildly cross-

wired. My neighbor demonstrated to the technician how shutting off the common service

in the hall in fact also shut off the smoke detector elsewhere, which would be dangerous

and in violation of codes. Seeing this, the Ever Source technician left, without

terminating electrical services that would have completely shut down electricity to my

Unit, the kitchen, and all other areas of the basement.

21.  I was extremely relieved not to lose the electricity service. Not long before, Mr.

Lawrence had interfered with the electricity service to my Unit, causing it to be shut off.

Being in the dark so terrified my 2 year old daughter that she was hypervigilant for over a

week. Concerned my daughter would be frightened again, for about a week after the

Eversource technician came and left without terminating the electricity, I stayed close

watching the building, in case he came back and tried to turn off the electricity again.

Usually, I stayed in the car parked nearby, keeping my eyes on the building in case the

Eversource man might return. I relaxed my guard after about a week.

22.  Throughout August and until I was placed into emergency shelter, I continued to avoid

being at my basement Unit with my children. I needed to be strong for my children, but

inside I was depressed and wondering what would become of us. One day we returned

home tired, and I immediately sensed something was wrong: the room was silent. The

fan in the water closet was not going. I always left the fan in the water closet turned on

to provide some ventilation, or otherwise there would be a serious mold problem. I knew

immediately that Mr. Lawrence had been in my apartment and turned off the fan to send

me a message that he had been there. I felt overwhelmingly insecure and wondered if it

6

was safer to sleep in the car. But a neighbor told me that if I did that, the Department of

Children and Families would take away my children. Again, I felt I had nowhere to turn

to because of Mr. Lawrence and the trap he had created for me and all the other tenants.

23.     One day when I returned home, I found that Mr. Lawrence had shut off the water supply

to the common kitchen (not his private kitchen in his apartment). Shortly after that, he

took away the refrigerator, the microwave and the tops of the stove to make sure I could

not cook. The following day, realizing I could just replace the stove tops to cook, he took

away the entire stove itself. By this time, I was so defeated, I couldn't even feel

desperate anymore. I called the police, but they told me they could do nothing because it

was a landlord tenant relationship and he was still the landlord, regardless of the fact that

he was in bankruptcy.

24.     Other tenants told me they were also feeling beaten down and depressed by the Mr.

Lawrence's terrible behavior and the need for constant vigilance it created, as well as the

uncertainty about what would happen to them because of Mr. Lawrence's bankruptcy.

Like me, they were also on edge constantly because they felt they had no choice but to

keep waiting, because despite all their effort, like me, they could not find any other

housing to move to.

25.     Because of Mr. Lawrence's complete disregard for his responsibilities as a landlord and

his complete lack of respect and appreciation that I, my children, and his other tenants are

people who deserve to be treated better, my daughter and I have suffered a great deal of

physical as well as emotional distress.

26.     I am thankful that with the help of the social worker from the High Risk OB/GYN Clinic

of the Boston Medical Center and legal services, I have been able to find some peace in

an emergency shelter.

Signed under the pains and penalties of perjury this _25th_ day of September , 2016,

_____

Michelle Modolo

# Incident Report

| | |
|---|---|
| Case Number | |

| | |
|---|---|
| CAD Incident # | P160485633 |
| Report Type | Incident Report |
| Date / Time Occurred | 09/15/2016 11:00   to   09/15/2016 20:00 |
| Date / Time Reported | 09/15/2016 20:46 |
| Page | 1 of 4 |

| Arrested Suspects | Additional Suspects 1 | Unknown Suspects | Victims 1 | Other Persons | Vehicles | Items | Evidence Count | Leoka Count | File # |
|---|---|---|---|---|---|---|---|---|---|

| | | | |
|---|---|---|---|
| ☐ Drugs | ☐ DVIP | ☐ Juvenile | ☐ Child Present | ☐ Elderly | ☐ Sexual Assault |
| ☐ CRU - Hate/Bias | ☐ Licensed Premise | ☐ Disabled | ☐ Homeland Security | ☐ Homeland Security - UASI | ☐ Home Invasion |
| ☐ Car Jack | ☐ Gun | ☐ Gang | ☐ Shots Fired | ☐ Victim Shot | ☐ Victim Stabbed |
| ☐ Other Agency/Unit Notified | ☐ Warrant Arrest | ☐ Search Warrant | ☐ Licensed Premise Violation | ☐ LPR | ☐ Human Trafficking |
| ☐ Bicycle | ☐ School | ☐ Homeless | ☐ Sex Offender | ☐ NIDV | ☐ Child Abuse |

### Incident Details

| Unit Number | Clearance Disposition | Cleared by Exception | Exceptional Clearance Date |
|---|---|---|---|

| Situation Found | Case Status |
|---|---|
| Walk-In | |

| Location Given By Dispatcher |
|---|

### Incident Address

| Street Address |
|---|
| 95 WALDECK ST |

| City | State | Zip | District |
|---|---|---|---|
| BSTN | MASSACHUSETTS | 02124 | DISTRICT C11 |

### Administrative Info

| Reporting Officer | Employee Number | Approving Supervisor |
|---|---|---|
| BUCKLEY, TAYLOR | 136616 | MACMASTER, KENNETH |

## OFFENSE

| | |
|---|---|
| ☐ Upgrade/Downgrade Offense | Upgrade/Downgrade Offense Code |
| ☑ Primary Offense | Crime Description INVESTIGATE PERSON |

| Offense Code Value | Attempted/Completed | Premise Type |
|---|---|---|
| 03115 | Completed | Residence/Home |
| | Circumstances | Bias |

| Criminal Activity 1 | Criminal Activity 2 | Criminal Activity 3 |
|---|---|---|

| Offender Using 1 | Offender Using 2 | Offender Using 3 |
|---|---|---|

| # Premise Entered | Home Invasion | Domestic Violence | Gang Activity |
|---|---|---|---|

| Gang Type #1 | Gang Name #1 |
|---|---|

| Gang Type #2 | Gang Name #2 |
|---|---|

| Drug Related | Drug Type | Drug Origin | Drug Precursors |
|---|---|---|---|

**MO Panel**

| Entry Type | Entry Area | Entry Method |
|---|---|---|
| Entry Point 1 | Entry Point 2 | Exit Point 1 |
| Exit Point 2 | Target Area | Property Target 1 |
| Property Target 2 | Property Target 3 | Victim Target |
| Time of Day | Victim Activity | Action 1 to Premises |
| Action 2 to Premises | Action 3 to Premises | Action 1 on Victim |
| Action 2 on Victim | Action 3 on Victim | Other Action 1 |
| Other Action 2 | Other Action 3 | Solicited Offered 1 |
| Solicited Offered 2 | Solicited Offered 3 | Weapon 1 |
| Weapon 1 Auto | Weapon 2 | Weapon 2 Auto |
| Weapon 3 | Weapon 3 Auto | Arson |

# Incident Report

| | |
|---|---|
| Site Number | CAD Incident # P160485633 |
| Report Type Incident Report | Page 2 of 4 |
| Date / Time Occurred 09/15/2016 11:00 to 09/15/2016 20:00 | Date / Time Reported 09/15/2016 20:46 |

| Precipitating Circumstance | Instrument Used |
|---|---|

**Unusual Actions and Statements of Suspect**

## SUSPECT  ☑ Known   ☐ Unknown   ☐ Arrested

**Name (Last, First Middle)**
LAWRENCE, OUWA

| Suffix | Nickname | Race Black | Gender Male | SSN | Date of Birth | Age | Age Range 58 to 62 |
|---|---|---|---|---|---|---|---|

| Height | Weight | Driver's License # | DL State | Local ID | SID |
|---|---|---|---|---|---|

| FBI # | SBI # | Place of Birth | Citizenship |
|---|---|---|---|

| Ethnicity Hispanic Origin | Marital Status |
|---|---|

| Preferred | Contact #1 | Contact #2 | Email Address |
|---|---|---|---|

### Suspect Home Address

| Street Address |
|---|

| City | State MASSACHUSETTS | Zip |
|---|---|---|

### Suspect Employment Information

| ☐ Student | Employer / School | Occupation |
|---|---|---|

| Street Address |
|---|

| City | State | Zip | Work Phone | Hours of Employment |
|---|---|---|---|---|

### Details

| Hair Color | Hair Length Bald | ☐ Glasses | Eye Color | Build Average | Facial Hair | Facial Hair Color |
|---|---|---|---|---|---|---|

| Voice | Complexion | Hand Preference |
|---|---|---|

| Clothing Description |
|---|

| Trademarks of Suspect |
|---|

| Injury 1 | Injury 2 | Injury 3 | Injury 4 | Injury 5 |
|---|---|---|---|---|

| ☐ Hospitalized | Hospital Facility | Resident |
|---|---|---|

**MO Panel**

| Entry Type | Entry Area | Entry Method |
|---|---|---|
| Entry Point | Exit Point | Target Area |
| Property Target 1 | Property Target 2 | Property Target 3 |
| Victim Target | Time of Day | Victim Activity |
| Action 1 on Victim | Action 2 on Victim | Action 3 on Victim |
| Action 1 to Premises | Action 2 to Premises | Action 3 to Premises |
| Other Action 1 | Other Action 2 | Other Action 3 |
| Solicited Offered 1 | Solicited Offered 2 | Solicited Offered 3 |
| Weapon 1 | Weapon 2 | Weapon 3 |
| Weapon 1 Type | Weapon 2 Type | Weapon 3 Type |
| Weapon 1 Caliber | Weapon 2 Caliber | Weapon 3 Caliber |

# Incident Report

| | |
|---|---|
| Club Number | CAD Incident # |
| | P160485633 |
| Report Type | |
| Incident Report | Page 3 of 4 |
| Date / Time Occurred | Date / Time Reported |
| 09/15/2016 11:00 to 09/15/2016 20:00 | 09/15/2016 20:46 |

| Weapon 1 Color | Weapon 2 Color | Weapon 3 Color |
|---|---|---|
| Arson | Precipitating Circumstance | Instrument Used |
| Comments | | |

## Associated Offenses

| Offense | | Associated With Suspect ☑ |
|---|---|---|
| INVESTIGATE PERSON | | |

| VICTIM | Victim Type | |
|---|---|---|
| | Person | |

| Name (Last, First Middle) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| MADOLO, MICHELLE | | | | | | | | |
| Suffix | Nickname | Race | | Gender | SSN | Date of Birth | Age | Age Range |
| | | Black | | Female | | 03/25/1995 | 21 | to |
| Infant Type | Height | Weight | Driver's License # | DL State | | | | |
| Place of Birth | | Citizenship | | | | | | |
| Ethnicity | Marital Status | | | | | | | |
| Preferred | Contact #1 | Contact #2 | Email Address | | | | | |
| HOME PHONE | 630-899-9298 | | | | | | | |

### Victim Home Address

| Street Address | | |
|---|---|---|
| 95 WALDECK ST | | |
| City | State | Zip |
| BSTN | MASSACHUSETTS | 02124 |

### Employment Information

| ☐ Student | Employer / School | | Occupation |
|---|---|---|---|
| College Name | | On Campus ☐ Yes ☐ No | |
| Street Address | | | |
| City | State | Zip | Work Phone | Hours of Employment |

### Details

| Hair Color | Eye Color | Build | Resident |
|---|---|---|---|
| Injury 1 | Injury Description | | |
| Injury 2 | Injury 3 | Injury 4 | Injury 5 |
| Victim Condition | Victim-Offender | | |

| A. Assault/Homicide ☐ Yes ☐ No | A. Assault/Homicide Circumstance 1 | A. Assault/Homicide Circumstance 2 |
|---|---|---|
| Justifiable Homicide ☐ Yes ☐ No | Justifiable Homicide Circumstance | |
| ☐ Victim Hospitalized | Hospital Facility | Hospital Description |

| Under Influence Alcohol? ☐ Yes ☐ No ☐ Unknown | Under Influence Drugs? ☐ Yes ☐ No ☐ Unknown | Domestic Disturbance | Domestic Violence Victim Transported ☐ Yes ☐ No |
|---|---|---|---|
| Violation of Protective Order ☐ Yes ☐ No | Cohabitant ☐ Yes ☐ No | | |

## Associated Offenses

| Offense | | Associated With Victim ☑ |
|---|---|---|
| INVESTIGATE PERSON | | |

Public Narrative

| | Case Number | | | CAD Incident # |
|---|---|---|---|---|
| | 162075477 | | | P160485633 |
| | Report Type | | | |
| | Incident Report | | | |
| | Date / Time Occurred | | | Date / Time Reported |
| | 09/15/2016 11:00    to    09/15/2016 20:00 | | | 09/15/2016 20:46 |
| | | | | Page  4  of  4 |

At about 8:30pm on Thursday 9/15/16 Michelle Madolo walked into District C-11 with her two daughters Lolade Oladele (DOB 5/5/14 and Olanike Oladele (DOB 7/27/16) to file a police report.

Victim stated she lives in a rooming house at 95 Waldeck st apt GL. Victim stated she left her residence today at 11:00am and locked her bedroom door. Victim stated when she came home at 8:00pm on today's date she observed her bedroom in shambles with her mattress up against the wall and all of her clothing all over the floor. Victim stated she believes her landlord Ouwa Lawrence, suspect listed above came into her room without her consent. Victim stated she lives in the room with her two children and does not have the strength to put her bed back together. Victim stated Lawrence shut off the water and took all of the appliances out of the common kitchen. Victim was advised to go to Boston Housing Court.

# Exhibit 3

## SUPPLEMENTAL AFFIDAVIT OF WILLIAM BAUTISTA

I, William Bautista, hereby attest to the following:

1.     My name is William Bautista.

2.     I live at 101 Waldeck St # 1, Dorchester, MA 02124 as a tenant of Uwa Lawrence.

3.     I have lived on Waldeck Street for virtually my entire life, with the exception of a few

years as a child when I lived in the Dominican Republic and a few years as an adult after

I got married.  Specifically, I have lived here for approximately the last twenty years.

Until 2007, I lived here with my grandfather, but since he passed away, I have lived

alone.  Because of this history, my apartment is a place with deep sentimental value to

me.  It's not just a place I live—it's home.

4.     Unfortunately, the years I've spent here with Mr. Lawrence as my landlord have been

deeply unsettling and stressful, mainly because he does a terrible job taking care of the

building and fixing problems in my apartment.  Many bad conditions have existed in and

around my apartment that he has known or should have known about, but refused to fix,

including a serious rodent infestation, major problems with my heat, and leaks in my

ceiling and walls.

5.     I hear mice crawling in the walls of the apartment all the time, and often have trouble

sleeping because I hear those noises and worry that the mice are going to crawl into bed

with me.  In addition, I've had to store food exclusively on high shelves and buy plastic

containers to make sure mice can't get to it.  On several occasions I've found holes or

bite marks in my t-shirts from where mice have chewed through them.

6.     In addition, the heat in my apartment has frequently been a problem.  Mr. Lawrence has

exclusive control over the heat to each of our units in the building (the thermostat in my

own apartment has been broken for years), and under his control, the heat is often either

turned off entirely or turned all the way up.  Consequently, in winter, my apartment is

typically either freezing cold or uncomfortably hot, such that I need to open a window.

However, if I open a window and Mr. Lawrence sees this, he gets very upset and shuts

down the heat.

7.      I have also frequently dealt with leaks in the ceilings and walls in my living room,

bedroom, and bathroom.  Though I can typically keep the apartment dry by simply

placing a bucket under the leak, the bigger problem is that these leaks often cause chunks

of solid plaster to fall from the ceiling around my apartment.  Once, chunks of plaster fell

on me while I was in my bed sleeping.  Luckily I avoided any serious injury, but it gave

me a real shock.  I have complained to Mr. Lawrence frequently about the leaks, and the

only "repairs" he performs in response involve superficially patching over the resultant

holes in the ceiling, rather than bringing in a plumber to patch the leaks at their sources.

8.      Aside from failing to keep my apartment in good condition, Mr. Lawrence has also

created problems for me with his erratic and deceptive behavior.  For instance, about four

years ago he served me with a "legal notice" that, he said, required me to pay

approximately $200 more each month in "constable fees" in addition to my portion of the

$1350 monthly rent under the Section 8 voucher program.  The "legal notice" looked

very official and he told me that I had to pay to stay, so I have complied by paying him

$200 monthly beyond my Section 8 share.  He even made sure to approach me after each

of my annual income recertifications with the Boston Housing Authority (BHA) to

remind me that the monthly "constable fees" were still due on a monthly basis even if no

such fees appeared in any of the paperwork with the BHA.  I only stopped paying these

"constable fees" very recently upon learning of his bankruptcy, and have learned that it is

2

illegal for him to collect such side payments from me beyond what he is allowed under the Section 8 program. .

9.    On another occasion, about a year ago, Mr. Lawrence tried to gain entry into my apartment without prior notice or permission by impersonating a Boston Police Officer. I remember hearing a loud, belligerent knocking on the door and a man yelling that he was from the police department, and feeling very uneasy and scared, because I had no idea why the police would be showing up without warning at my apartment. I answered the door to see Mr. Lawrence there, supposedly to try to look at a leak in my ceiling. He didn't explain why he had gone through the effort of faking that he was a police officer and trying to intimidate me instead of just asking if he could come in—I felt very uncomfortable and uneasy with his behavior. He enjoyed behaving in this intentionally intimidating way with his tenants, with knowing disregard for the distress it was certain to cause the tenants, myself included.

10.    A couple of years ago, Mr. Lawrence decided without permission to connect my electric meter to the public meter controlling the electric heating for the entire building. This carried on for several months, then, after I noticed that my electricity bills were oddly high, I went to the basement and checked to see what was going on, and saw what he had done. It infuriated me, so I took pictures and a video of it with my phone and told Mr. Lawrence that I had proof of what he'd done. His response was lock the basement.

11.    Mr. Lawrence frequently lingers around the buildings, without any apparent purpose, on Waldeck Street either very early in the morning or very late at night. It feels like he's out there just for the purpose of intimidating his tenants—it's very creepy. I regularly leave for my job at 3:30 A.M. and don't feel safe stepping out without first checking to see whether he's around—his presence makes me and other tenants feel very uneasy.

3

12.     In early 2016, I got a letter from the Boston Housing Authority (BHA), the agency that

pays a part of my monthly rent and administers my Section 8 voucher, asking me to come

in for an appointment.  When I came in, they told me that they were ending the Section 8

contract with Mr. Lawrence because of the bad conditions in the building and his refusal

to fix them, and that I had three months to find another apartment or I'd lose my voucher.

They said they were not letting any more Section 8 tenants to rent with Mr. Lawrence

because his unlawful conduct extended to all his tenants and buildings.  I was

devastated—not just because I'd have to leave the only home I'd really ever known in

Boston, likely for good, but also because I had no idea where I'd go in this rental market..

I was terrified at the prospect of not being able to find a new place and losing my

voucher, through no fault of my own and entirely due to Mr. Lawrence's willful and

intentional disregard for his obligations as a landlord under Massachusetts law and the

Section 8 program.  I know that most of the tenants at Waldeck have Section 8 subsidies

from different housing authorities, so the threat of homelessness and irreversible loss of

Section 8 voucher was not limited to me.  Mr. Lawrence's knowing and callous

indifference to what his tenants are suffering because of him is outrageous and almost

beyond belief.

13.     I looked all over Boston to find a new place to live, but couldn't find any places available

for $1350/month or less, which was the maximum rental amount I was able to pay with

my Section 8.  After three months, I couldn't find a new place, so BHA gave me 60 more

days; when that time period expired, I thought for sure that I'd lose my voucher for good,

but fortunately, I connected with legal services groups and the community organization

City Life/Vida Urbana, who worked with BHA and the Metropolitan Boston Housing

Partnership to make sure the tenants' Section 8 vouchers would be preserved at least until

the uncertainty surrounding the ownership of my building gets resolved in the bankruptcy court. They also let the tenants and the housing agencies know about Mr. Lawrence's bankruptcy and to pay rent to the bankruptcy trustee and not to Mr. Lawrence. Yet, Mr. Lawrence continued to lie and tried to collect rent from the tenants.

14.    The anxiety I've experienced over the past six months, and continue to experience due to not knowing what's going to happen to me and to my home of over twenty years, has had a devastating impact upon my physical health. Since I first heard from BHA that they I had to find a new place or lose my Section 8, I've lost about 95 pounds from the stress, and gone from a size 44 work uniform to a size 32. In addition, also due to the stress, I've developed psoriasis on both my hands, meaning that they frequently get dry and cracked and painful. My knuckles bleed from the dryness all the time, meaning that when I go to my job at the airport now I almost always have to wear latex gloves and/or keep my hands in my pockets all day. I was told by a good friend who is a doctor that my weight loss may be due to anemia caused by chronic stress I have had to endure with respect to my housing situation. Indeed, the horrible mess Mr. Lawrence has made of my life, and the lives of all of his other tenants, has been devastating to everyone and made me a nervous wreck.

**[Signature on following page]**

5

Signed under the pains and penalties of perjury this _____28th_____ day of _____September_____,
20_16_.

_____

TENANT: *William Bautista*

ADDRESS: *101 WALDECK ST #1*
*DORCHESTER, MA 02124*

# Exhibit 4

## SUPPLEMENTAL AFFIDAVIT OF DARCELL HINES

I, DARCELL HINES, hereby attest to the following:

1.    My name is **DARCELL HINES**.

2.    I live 93 Waldeck St. #1F, Dorchester MA 02124.

3.    I have lived at 93 Waldeck St. since March 28, 2015, as a tenant of Uwa Lawrence.

4.    From the time I moved in, Mr. Lawrence has shown a complete lack of respect for the laws he is obligated to follow as my landlord and has subjected me to abusive treatment that has caused me physical as well as emotional distress.

5.    For example, Mr. Lawrence has failed to repair numerous bad conditions in my apartment that he knew or should have known about, including the cross wiring, intentionally and maliciously cutting off my electric service (that also cuts off my heat) to try to force me to move out of my apartment, cutting off my hot water to harass me, the presence of mold in the bathroom and the bedroom, and mice and roaches everywhere.

6.    I learned that my electricity was paying for common areas in 93 and 91 Waldeck Street, and for an illegal basement apartment.  My electricity would get blown out and, when I complained to Mr. Lawrence, he would insist that it was somehow my fault.  I discovered that in reality the electricity was being blown out by whatever Mr. Lawrence had done to the wiring within and between 91 and 93 Waldeck Street buildings, which are connected buildings.  In the course of illegally subdividing of the three two-bedroom units in each building into six one-bedroom units, without any permits and without using legitimate licensed electricians, Mr. Lawrence had made a huge mess of the electrical wiring.  I discovered this because at some point, when Eversource shut down the electricity to 91 Waldeck Street, my electricity in 93 Waldeck Street also went off.

7.    The cross metering was confirmed by the Inspectional Services Department, which came

because I had no heat, which is run in my apartment via electricity. I had not been able to

get Mr. Lawrence to fix the heating problem, and I was tired of being constantly cold.

While I know from other tenants that Mr. Lawrence does not care whether any tenant is

without light or heat, in my case, he intentionally terminated my services in retaliation for

BHA stopping my Section 8 payments for his refusal to make cited repairs. Although I

have a thermostat in my apartment and I pay for the electricity, the electrical circuit

breaker is down in the basement which Mr. Lawrence keeps locked and which tenants

cannot access. When BHA stopped my Section 8 payments because Mr. Lawrence

refused to make the repairs that he had been cited to make, he retaliated by cutting off my

electricity in the basement. He wanted force me to leave immediately so he could get in

new tenants and collect their first month, last month and security deposit money. Mr.

Lawrence's pattern of abusive behavior was that when ISD came as scheduled, he would

turn on the electricity from downstairs while the inspector was here, but as soon as the

inspector left, he would shut down my electricity again. I couldn't get into the basement

to turn it back on. The inspector finally had to pretend to leave, and then run downstairs

to the basement to catch Mr. Lawrence in this act. With another tenant Mr. Lawrence

was upset with, and he wanted for force out without legal process, Mr. Lawrence just

ripped out the circuit breaker so the tenant couldn't get the electricity back on.

8.    Because of Mr. Lawrence's extreme lack of concern for his tenants and utter disregard of

the law, and what I experienced as bullying and retaliation, I have suffered numerous

serious health problems. These include:

❖ Mr. Lawrence openly lied about and tried to hide the illegal cross metering and

subdivision of apartments. Though he was totally responsible, he lied to the ISD

2

inspector that the electricity going out was my fault—that it was terminated

because I did not pay my bills. While I continued without success and with

despair to look for another apartment, I was constantly presented with a choice of

confronting this large man who was bullying me and facing more retaliation, or

accept living without electricity and no heat sometimes. Mr. Lawrence's pattern

of intentionally abusive behavior made it very difficult to relax in my home.

❖ This past winter I got sick with the flu, chronic coughing, and other illnesses that

directly resulted from the lack of heat.

❖ I have sleep apnea and I use a breathing machine at night, but because of the cut

off of electricity, I cannot use the machine. I frequently wake up and thus get

inadequate sleep which makes me very tired during the day. I can't think clearly

because I'm so tired.

❖ In June 2016, I severely reinjured my ankle due to Mr. Lawrence's failure to

repair and restore my electrical service. This reinjury resulted from tripping over

wires, which I had to use as a makeshift way to get electricity for the refrigerator.

The sole operable socket in the entire apartment after Mr. Lawrence maliciously

shut down my electricity in the basement is in the bathroom. I assume my

bathroom socket continued to work after Mr. Lawrence cut off the rest of my

electricity because it was on a different circuit connected to another apartment's

meter after the illegal subdividing. To this day, I am still wearing a foot brace.

This has extremely limited my mobility.

❖ Because of my foot injury, I was let go approximately July 5 from my night baker

job at Panera Bakery. They told me I could come back when my foot healed, but

in the meantime, I have no income. The foot injury and brace has also made it

3

difficult to use public transportation and restricted my ability to take care of my grandchildren. .

❖ In addition to losing income because of injury caused by Mr. Lawrence, I was forced to add to my expenses by getting a cat. Even though I am constantly worried about paying my bills, this was the only way to deal with the mice infestation.

❖ The cat dealt with the mice inside my apartment, but not the rats in the back. I have been afraid to go out back to take out the trash because of the rats. The last time I took out the trash and lifted the lid off the garbage barrels, I saw several heads of big rats staring back at me. I had to run – but very awkwardly with my brace. I haven't taken out the trash to the back since. I hold onto it until trash collection day and deposit it in front, but I have to be vigilant and time it so I am not too late. The rats are huge, and I'm always worried about them getting inside because I'm on the first floor, and my cat is not able to deal with them.

❖ I have been seeing a therapist since May to deal with the emotional distress of these bad conditions. I have to take medication now to calm myself. I have deep sadness triggered by these conditions, the threat of homelessness, dealing with Uwa Lawrence, and being cold in the winter.

9.    In addition, Mr. Lawrence, his son, or his workers have repeatedly entered my home without notice and/or advance permission, absent any emergency. Mr. Lawrence's son came with workers and entered my apartment last winter while I was here, without knocking. After that, they did knock, but continued to enter without notice or permission. As a result of these incidents, I have experienced extreme anxiety. Because I'm scared, I can only sleep in in my apartment when a family member is there with me. When a

4

family member is not there, I sleep at my grandchildren's home.  I also make sure to put powder at the entrances to my apartment when I leave so I can detect if Mr. Lawrence, his son or workers have been in my apartment.

10.    My anxiety related to Mr. Lawrence is not just the result of him entering my apartment without permission.  It is also the result of what I know Mr. Lawrence has done to other tenants and is capable of doing, especially to single women and mothers.  Recently, when a single mom with a baby and toddler refused to give him any more rent for her illegal apartment, because Mr. Lawrence was no longer the owner, Mr. Lawrence removed all of her kitchen appliances, and one day when she came home, she found her belongings scattered everywhere and her bed turned over so she and her babies couldn't stay there anymore.  The police came but couldn't find Mr. Lawrence.  The inspectors from ISD also told me about an incident at Mr. Lawrence's other property at Orlando St. where Mr. Lawrence poured gasoline on the common area carpets because he was angry with the tenants.

11.    I am deeply unsettled and anxious by the uncertainty surrounding my housing. Specifically, I receive a subsidy from the Boston Housing Authority, but the BHA has not made payments for my apartment since approximately January of 2016.  Because payments were discontinued I was issued a new voucher and told to move.  The BHA only permits me to hold a voucher for a certain amount of time without losing it, and because it was nearly impossible for me to find an alternative apartment where I can use my voucher, given how high the rents are currently across Boston and surrounding suburbs, I was terrified that I would lose my Section 8 and become homeless if the current situation at my building didn't get resolved soon.  I took Mr. Lawrence to court to force repair of bad conditions partly in order to retain my Sec. 8.  Because Mr. Lawrence

5

willfully never appeared in court, the judge issued a capias for his arrest to be brought to court. However, because of his bankruptcy everything is now on hold, including the order for his civil arrest. This real threat of homelessness and loss of subsidy makes me constantly anxious. The loss of my Section 8 because I can't find another apartment remains a real threat, depending on the outcome of the current bankruptcy sale.

12.     Mr. Lawrence has also harassed and intimidated me by giving me an eviction notice. I had done nothing wrong, but the Boston Housing Authority had stopped paying as a result of bad conditions he refused to fix. When handing me the eviction notice based on the false allegation that I had not paid rent, he threatened that the eviction notice would go on my record and I would have trouble finding an apartment. As a result of this threatened eviction, I have experienced a lot of fear of homelessness. I was once homeless for 6 months, and Mr. Lawrence's threats triggered further anxiety. Mr. Lawrence took me to court falsely accusing me of not paying rent, but the judge threw out the eviction case because Mr. Lawrence couldn't prove that I didn't pay rent, and I pointed out to the judge that the only reason he was not paid by BHA was due to his own fault of not making repairs. Mr. Lawrence then brought a new eviction action, which is officially still open. In the interim, I have been forced to live out of boxes because I was never sure when I would be kicked out.

13.     During this time, because of all the stress Mr. Lawrence has caused, I have not been able to properly take care of my very elderly mother. I came to Boston to take care of my mom, but in June 2016, at the most critical time when she needed me, I failed to help her from losing her home of 10 years by a no-fault eviction. At the time, I was personally so overextended physically and emotionally from trying to protect myself from the wrongful and retaliatory eviction actions Mr. Lawrence had taken against me, worrying constantly

6

about the imminent possible loss of my Section 8 voucher, and conducting a tiring housing search with limited mobility. I feel deep sadness for failing my elderly mom at her time of need, but also anger toward Mr. Lawrence, who created this situation by harassing me to the point that I am unable to attend to other important matters in my life, like protecting my mother from an entirely avoidable eviction.

14. The landlord's conduct as described above caused me to suffer physical health problems as well as severe emotional distress, including loss of sleep; suicidal thoughts; crying; depression; and anxiety. I told my therapist that if I didn't believe in God, I would have killed myself. I look okay from the outside, but on the inside I'm broken down and severely sad. I was prescribed Zoloft to deal with this depression.

15. The landlord's behavior has been especially burdensome to me because I am physically disabled due to the foot injury caused by his intentional termination of electricity services to my apartment as described above, and the landlord's constant harassment has made me depressed and unable to engage in and enjoy social functions, including with my family. For example, I recently declined the offer of birthday festivities on my behalf because I could not imagine having the energy and joy to share with those wishing me well.

16. I have discussed my housing situation with my therapist and my social worker at the South End Health Center, as well as with my doctors at the Boston Medical Center.

**[Signature on following page]**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _27th_ of _Sept_ 2016

Printed Name -- _Darcell Hines_

# Exhibit 5

## SUPPLEMENTAL AFFIDAVIT OF MIESHA WARREN

I, MIESHA WARREN, hereby attest to the following:

1.    My name is **MIESHA WARREN**.

2.    I live at 25 Orlando St., Apt. 3, Mattapan, MA 02126.

3.    I have lived in this apartment since September 2014.

4.    My landlord is Uwa Lawrence, also known as Uwagboe O. Oru-Lawrence.

5.    Mr. Lawrence has failed to repair numerous bad conditions in my apartment that he knew

or should have known about, including a lack of hot water, lack of heat in common areas,

lack of electricity in common areas, infestation of mice and roaches, broken windows,

and a buildup of trash in and around the building.

6.    Mr. Lawrence's overall failure to adequately redress the problems in my apartment have

increased my anxiety and stress. There have been frequent shutoffs of the hot water,

either due to a broken pipe or because Mr. Lawrence didn't pay the bills.  When this

happens, I have to go to a relative's house or boil water on my stove in order to bathe.

Either way presents an extreme inconvenience for me—I am sixty years old and have

limited mobility, due to my age and my physical disabilities.

7.    In addition, because the electricity often does not work in the common areas, I need to

use my cell phone for light when I am walking through the hallway to enter and exit my

basement apartment.  I fear that I may fall down the stairs when the lights aren't working

or someone will attack me because there are no lights.

8.    I am also severely concerned over Mr. Lawrence's lack of care for sanitary conditions.

There are mice and rat infestations and the garbage is not properly taken out or disposed

of because there is construction debris littered around the internal and external common

areas. Because of these issues, there is often a terrible smell around the property,
especially when it is hot outside and Mr. Lawrence does not address other tenant's lack of
sanitary practices. In order to avoid these conditions and limit how much I need to
experience or think about them, I mostly keep to my bedroom when I am at home,
limiting my full access and enjoyment of my apartment.

9.      I am also extremely fearful because Mr. Lawrence refused to replace or repair the iron
bars covering my windows after he tore them down. When someone tried to break in to
my apartment, he replaced the bars and windows with plywood. Aside from being ugly
and a potential fire hazard, the plywood still makes me anxious because it seems to me
that anyone can knock the wood in and enter my home if they want to break in.

10.     In addition, Mr. Lawrence has repeatedly entered my home without notice and/or
advance permission, absent any emergency. There are two specific times I remember.
The first time was right after I moved in, and I looked up and all of a sudden someone
was in my apartment. Mr. Lawrence said it was to do some work. It was very upsetting
and disruptive to have Mr. Lawrence in my home without warning. The second time, also
shortly after I moved in, Mr. Lawrence and his worker came in while I was in my
bedroom trying to sleep, forcing me to confront them in my robe when I went to see who
had come into my apartment. This behavior also caused me to fear for my security so I
changed the locks. These incidents and countless others have disrupted my right to peace
and quiet in my home and caused me stress, embarrassment, and anxiety.

11.     Mr. Lawrence has also harassed or intimidated me by frequently coming into the building
and referring to me and other tenants as "crackheads." Further, in June 2016, shortly
after I signed a letter alongside other tenants to respectfully ask Mr. Lawrence to fix bad
conditions around the building and to treat tenants with respect, Mr. Lawrence served me

2

with an eviction notice.   In fact, my co-tenant who delivered our letter to him personally

told me that he ripped up the letter and said "That's how people get evicted," so I believe

that Mr. Lawrence sent me the eviction notice to retaliate against me for signing the

letter.   Getting an eviction notice, even though I am a good tenant and pay my rent on

time and as a response to me exercising my legal right to demand better conditions in my

apartment, deeply upset me and made me scared for my future.   I do not know where I

would go if I were to be evicted and it is extremely difficult to find an apartment on short

notice in Boston, given how high the rents are across the city.

12.     Because of Mr. Lawrence's careless approach to maintaining the property, as well as his

intentionally harassing behaviors, I have experienced numerous serious health problems

as well as severe emotional distress. I have lost sleep, suffered severe anxiety, and even

lost weight—between 25 and 30 pounds since I moved in—because of the landlord's

conduct. I have trouble keeping food down, and I frequently have diarrhea and problems

with my appetite due to the bad smell and other byproducts of the bad conditions in the

building, especially the mouse infestation and trash buildup. I was even hospitalized

twice for a stomach virus, which I believe was also caused by Mr. Lawrence's failure to

maintain the building in a safe and habitable condition and address unsanitary behaviors

of another tenant.   In addition, I feel incredibly unsafe and anxious at all times of the day,

and I believe my elevated levels of stress has aggravated my preexisting medical

conditions, including and especially my chronic kidney disease which is a byproduct of

diabetes.  Since moving in, my kidneys have worsened from Stage 2 to Stage 4 failure,

and I am worried that I will soon have to go on dialysis.

13.     I have discussed my housing situation, and specifically the connection between my

housing situation and my health, with ETHOS, the elder rights and services organization.

3

I told them how bad the conditions were and how bad Mr. Lawrence had treated me. ETHOS then investigated for elder abuse and did an intake of my case.

14.     From the time I moved in, Mr. Lawrence has shown a complete lack of respect for the laws he is obligated to follow as my landlord and has subjected me to abusive treatment that has caused me physical as well as emotional distress.  His total indifference to his responsibilities as my landlord makes me feel like he is also indifferent to how his behavior impacts my physical and emotional health.

**[Signature on following page]**

Signed under the pains and penalties of perjury this _____27th_____ day of _____September_____

20 16

TENANT: Miesha Warren

ADDRESS: 25 ORlando St #3
Mattapan, MA 02126

# Exhibit 6

## SUPPLEMENTAL AFFIDAVIT OF TESSY ADEWUMI

I, TESSY ADEWUMI, hereby attest to the following, on behalf of both myself and my two minor children:

1. My name is Tessy Adewumi.

2. I live at 101 Waldeck St. #3R, Dorchester, MA 02124 with my elderly mother and my two children.

3. My mother is 63 years of age, and my daughters are 3 and 5 year old.

4. I have lived at 101 Waldeck St. #3R, Dorchester, MA 02124 since April 2016 as a tenant of Uwa Lawrence.

5. Mr. Lawrence has failed to maintain the property in good repair and allowed a rat infestation in my building.

6. Although I live on the third floor, I have rats in my kitchen every day. They come in through the back door and from holes in the walls. I often see the rats on my kitchen floor, on our dining table, and in my oven. Even when I cannot see them, I repeatedly find rodents droppings in the kitchen.

7. In order to keep my daughters healthy and safe, I sanitize the kitchen as best as I can every morning before my children wake up, and then again in the evening when I am back from work. My cleaning supplies adds up to 30-40 dollars each month.

8. Many times I had to throw away good food I had in my kitchen because the rats got to it.

9. The rats are destructing the house because they are chewing right through the window nets.

10. Despite my efforts, my older daughter has repeated infections, which require urgent visits to medical providers and antibiotics.

11.   My youngest daughter is too young to understand, but my oldest daughter is embarrassed by the situation and by her friends knowing of the rats. This creates anxiety for her.

12.   Both my daughters have a hard time sleeping because of the rats. They often wake up in the middle of the night from noises and cry for help thinking there are rats in their beds. They then have a hard time going back to sleep. The loss of sleep aggravates our anxiety and stress.

13.   In addition, I had two problems with the plumbing in my apartment. Because the landlord did not fix it, I had to call a plumber. I had a relative help me by paying out of pocket for the plumbing service. The second time the same problem happened, I had it fixed by a neighbor. I did not pay for the service but received help from your neighbor and relative.

14.   Mr. Lawrence has also harassed and intimidated me on September 18, 2016. He then sent me an email demanding that I pay rent, and also sent me a text message to my phone stating that I have to pay rent.

15.   Before moving in to my current apartment, I lived with family relatives. I cannot move back there; I am afraid that if I have to move out, me and my family will become homeless. This situation has created anxiety and stress for me.

16.   Since the beginning of September, there has been a group of men outside the building and sometimes women, the group size ranges between 7-8 people. They are always drinking, smoking, fighting, and causing loud noises outside of the home. They block the doorway and I would have to ask them politely to allow me to walk through so I can enter my home.

17.   From the time I moved in, Mr. Lawrence has shown a complete lack of respect for the laws he is obligated to follow as my landlord and has subjected me and my family to cruel and abusive treatment that has caused us physical as well as emotional distress. His

2

refusal to pay attention to his responsibility to me and my family as our landlord made

me feel like he was callous and completely indifferent to how his behavior affected both

our physical and emotional well-being.

**[Signature on following page]**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this ___28___ of __September_ 2016

_____

Printed Name -- *Tessy Adewumi*

Exhibit 7

## SUPPLEMENTAL AFFIDAVIT OF SITARAH YOUNG

I, SITARAH YOUNG, hereby attest to the following:

1.      My name is **SITARAH YOUNG**.

2.      I live at 97 Waldeck Street #3F, Dorchester, MA, 02124.

3.      I am a tenant under lease and my landlord is Uwa Lawrence, also known as Uwagboe O.
        Oru-Lawrence.

4.      Mr. Lawrence has failed to repair numerous bad conditions in my apartment that he knew
        or should have known about, including an infestation of mice and mice droppings, a
        broken or defective stove that gave off a gas odor, a lack of hot water for approximately
        one week, no electricity for several days, broken outlets and insufficient electricity in the
        living room, holes in the walls and cracked windows, broken lighting in the common
        area, and uncovered trash behind the buildings.

5.      Because of Mr. Lawrence's extreme carelessness with respect to his duty to keep my
        apartment in good conditions, I have experienced numerous serious health problems.  I
        suffer from asthma and the bad conditions in my apartment have made my asthma worse.
        In particular, the gas odor emanating from the stove has resulted in my having attacks
        more frequently.  Further, the bad conditions in the apartment have caused me extreme
        levels of stress and anxiety.

6.      In addition, the rodent infestation greatly interfered with my everyday use of my
        apartment and caused me emotional damage. For example, I had to throw away food that
        is ordinarily has a long shelf life, such as pasta and flour, which was a waste of food and
        money. I changed my method of buying groceries because of rodent problems eating

food. Instead of grocery shopping every week, I now have to go to the store every other day because of the rodent problems, which have dramatically compromised my ability to store food. Because I have to put all of the food in the refrigerator to prevent the rodents from eating it, I have to buy less food at a time due to lack of room available in fridge.

7.  In addition, Mr. Lawrence repeatedly has shut off the water, causing me to either boil water to bathe or have to go to a friend's house to shower there instead. This is not only a great inconvenience but also increases stress.

8.  Mr. Lawrence has also harassed or intimidated me by consistently fighting with me when I bring up my concerns about the apartment to him, rather than addressing any of those concerns. For instance, on numerous occasions, Mr. Lawrence has argued with me belligerently about my electricity bill, which I have long believed to be too high due to issues regarding the wiring of the building. Another time, when I noticed that my food had gone bad after the electricity had gone off, Mr. Lawrence responded by not redressing the problem and by advising me to get a cooler instead.

9.  The landlord's conduct, as described above caused me to suffer both physical health problems as well as severe emotional distress, including feelings of anxiety and shame. I am extremely worried about where I will go and the status of my voucher in the event I have to move, because it is extremely difficult even for Section 8 voucher holders to find affordable places to live in Boston, given how fast the rents have been growing lately. I have not been to any doctor recently because I feel too stressed to go and I feel ashamed to tell doctors of the housing issues that are having a huge impact on my life.

10. From the time I moved in, Mr. Lawrence has shown a complete lack of respect for the laws he is obligated to follow as my landlord and has subjected me to abusive treatment

that has caused me physical as well as emotional distress.  His total indifference to his responsibilities as my landlord made me feel like he was also indifferent to how his actions affected both my physical and emotional well-being.

**[Signature on following page]**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this ___27___ of ___Sept.___ 2016

SITARAH YOUNG

Printed Name --

# Exhibit 8

## SUPPLEMENTAL AFFIDAVIT OF JOAN BAEZ

I, JOAN BAEZ, hereby attest to the following:

1.     My name is **JOAN BAEZ.**

2.     I live at 91 Waldeck Street # 2F, Dorchester MA, 02124, since late June 2016.  Prior to that I lived at 99 Waldeck St # 2F, Dorchester MA, 02124, from November 2015 to June 2016.  At all times, I have been a tenant of Uwa Lawrence.

3.     Mr. Lawrence has failed to repair numerous bad conditions in my apartment that he knew or should have known about, including a very serious mouse infestation.  In addition, he has failed to secure the building and surrounding property from strangers who cause constant disruptions and have prevented me from quietly enjoying my apartment.

4.     I have had to deal with the mouse infestation since moving into my original apartment at 99 Waldeck.  The mice made my apartment a disgusting place to live and made it tremendously difficult to sleep inside my apartment—I would frequently observe them crawling up my walls and hear them in the ceiling, and find droppings all over the apartment.  I caught them in traps all the time and tried to tape over the bottom of my door so they couldn't get in from the hallway, but nothing worked—Mr. Lawrence never exterminated, so they would keep coming back.

5.     Because of the mouse infestation, I would rarely use my kitchen for anything other than to sit and drink coffee or tea.  I didn't want to run the risk that mice would get into my food.

6.     Another serious problem I've had is that the water from my sink and shower frequently comes out brown.  I'm worried that I'll get sick if I drink or bathe in it, so I'll often go elsewhere to shower or spend the night.

7.    Mr. Lawrence has also done nothing to keep out strangers, including criminals and drug

addicts, who like to use the building hallway and adjoining parking lot to make noise and

cause trouble, even though I've asked him repeatedly to do a better job to secure the

building.  Sometimes these people will make noise until 3:00 or 4:00 in the morning.  I

have serious trouble sleeping at my apartment, so I often go elsewhere to sleep.

8.    From the time I moved in, Mr. Lawrence has shown a complete lack of respect for the

laws he is obligated to follow as my landlord and has subjected me to cruel and abusive

treatment that has caused me physical as well as emotional distress.  His refusal to pay

attention to his responsibility to me as my landlord made me feel like he was callous and

completely indifferent to how his behavior affected both my physical and emotional well-

being.

**[Signature on following page]**

2

Signed under the pains and penalties of perjury this ___27th___ day of ___September___,

20_16_

TENANT: Joan Baez

ADDRESS: 91 Waldeck Ave St

Dorchester MASS 02124

# Exhibit 9

## SUPPLEMENTAL AFFIDAVIT OF STARR MOSLEY

I, STARR MOSLEY, hereby attest to the following:

1.    My name is **STARR MOSLEY**.

2.    I live at 99 Waldeck Street #3F Dorchester, MA 02124.

3.    I have lived in this apartment since February 2015.

4.    My landlord is Uwa Lawrence, also known as Uwagboe O. Oru-Lawrence.

5.    I am a tenant of Uwa Lawrence, my landlord.  For the first year of my tenancy, I had a lease, but the lease expired without renewal, making me a tenant at will.

6.    Mr. Lawrence has failed to repair numerous bad conditions in my apartment that he knew or should have known about, including a prolonged lack of hot water, an infestation of mice, a broken unit main door, a broken unit fire exit door, broken windows, missing heating covers, a moldy bathtub, missing carbon monoxide detectors and fire control panel, no trash removal system, and no lighting facilities or electricity to common areas, such as hallways and stairwells.

7.    Because of Mr. Lawrence's extreme carelessness, I have experienced numerous serious health problems, including severe emotional distress. I have lost sleep, suffered severe anxiety, and lostweight because of the landlord's conduct. I feel stressed and anxious at all times of the day.

8.    I am working more hours at three separate jobs to save money, because I fear that I will not have a place to live soon. Working such long hours and commuting regularly to three separate workplaces has cause extreme weight loss. I do not even know where I will move in the event I can't stay at Waldeck.

9.    Furthermore, due to the rodent infestation I have not gone grocery shopping since June 2016 because there isn't a safe place to store my food. I have bank records to show my grocery

shopping trends, and how they have changed. In the evening the rodents sometimes would keep me up because I can hear them running around the house. This adds to my anxiety and stress because I cannot fall asleep knowing that I have a rodent infestation in my house.

10.     The disturbances caused by the rat infestation is a daily occurrence and as a result I also have to move my food and beverages and store them so the mice cannot access them. The mice have also damaged my clothes with bite marks so I now have to store those in suitcases to keep the mice from ruining them. I have spent my own money dealing with the mice, such as on mothballs and trying to fix the holes in the walls and floors. I have to constantly disinfect the walls up to the ceiling, counters, and other surfaces and using bleach at least once per week, which causes me to have to leave my house so I do not breathe in the fumes from cleaning.

11.     I do not have the time to see a doctor on account of my work schedule, but I believe that the mold problem in my bathroom may be contributing to a rash and breakouts that I have recently developed on my skin.

12.     The lack of hot water has been an inconvenience to me because I haven't been able to bathe at home. This has happened once last summer for two weeks and then once again this February for several days. As a result, I've had to stay at a friend's place during the time that there was not hot water.  My friend's apartment is farther away from my jobs than my apartment on Waldeck, which makes my daily routine even more inconvenient and stressful.

13.     Due to Mr. Lawrence's failure to secure the building—or at least make sure that the front door to the building has a working lock—drug addicts frequently break into the building and sleep inside the front entryway.  This has made me feel extremely uncomfortable and fearful, to the point where I have asked other people to escort me into my own building at night.

14.     In addition, Mr. Lawrence has called earlier this year at 3:00 A.M. to harass me because tenants on the second floor, directly below my unit, were having issues with their ceiling, and

he believed that I had something to do with it. It was extremely disruptive and stressful to take a belligerent phone call from my landlord in the middle of the night.

15.     I have not started to look for housing yet because (1) I have taken on three jobs that keeps me busy just so I can save up for a new apartment if things do not work out in my favor and (2) I am stressed out with having to deal with the terrible conditions in my current home - these two factors alone prevents me from actually having proper time to seek housing. In addition, this location is essential to me because I do not drive and need to stay somewhere easily accessible. I do not know where else I would go, as I had initially planned to remain in this apartment for a while and as previously mentioned, I do not have time to search for alternative housing. The uncertainty about what will happen in the future concerning the building and what to do for housing is causing me to have high levels of stress and anxiety.

16.     The landlord's conduct, as described above, caused me to suffer physical health problems as well as severe emotional distress, including anxiety, weight loss, and significant loss of sleep. His complete lack of respect for the laws he is obligated to follow as my landlord makes me feel like he is completely indifferent to how his behavior has impacted my physical and emotional well-being.

**[Signature on following page]**

Signed under the pains and penalties of perjury this ___37___ day of ___Sept.___ , 20_16_,

Starr Mosley

# Exhibit 10

## SUPPLEMENTAL AFFIDAVIT OF DWIGHT SAM

I, DWIGHT SAM, hereby attest to the following:

1. My name is **DWIGHT SAM.**

2. I live at 97 Waldeck Street #3R, and have lived there since May 3, 2016.

3. I am a tenant under lease of Uwa Lawrence, my landlord.

4. Mr. Lawrence has failed to repair numerous bad conditions in my apartment that he knew or should have known about, including an infestation of mice, roach infestation, broken window locks throughout the apartment, inadequate lighting in the stairwell and other common areas, refrigerator makes loud noises, and uncovered garbage cans out back attract rodents. Mr. Lawrence's failure to address these problems has caused me great stress and anxiety.

5. Because of the roach and mice problem, I now have to keep my food in the refrigerator and buy less food because there is not enough space in the refrigerator for all my food. It is an inconvenience because I have to travel to the store more frequently. My diet has changed and became less healthy because I have switched to eating processed food and microwavable food, which is easier to store and keep safe from the mice and cockroaches.  In addition, the rodent problem has caused me to lose sleep.

6. In addition, the locks on my windows are broken, which makes me feel anxious and unsafe. I am concerned if others know about the broken locks, then they could easily break into my apartment and this has me in a constant state of fearfulness.  Because I am legally blind, I feel very vulnerable inside an apartment with these types of security problems. Sometimes these thoughts do keep me up at night because I fear for my safety.

7. In addition, my refrigerator is broken because although it still keeps things cool, it makes very loud noises, like knocking, that keep me up at night. I have repeatedly tried to call Mr. Lawrence to get him to fix the refrigerator without any success. The first time I called Lawrence about the refrigerator, he said he would send someone out. No one came to fix the refrigerator; since then, after a few attempts Mr. Lawrence just stopped picking up the phone or would tell me the repair person would come when no one did. This made me lose confidence in his truthfulness and his ability to resolve issues. As a result of these incidents and Mr. Lawrence's inability to cooperate with me to resolve problems, I have experienced increased anxiousness and high levels of stress.

8. The landlord's behavior—specifically his carelessness with respect to the maintenance of the property—has been especially burdensome to me because I am legally blind. The building has had problems with the electricity in the hallways ever since I've been here, and I am concerned and anxious that with the lack of light in the hallways, someone could hurt or attack me without warning. In addition, I am unable to work because of my disability, and as a result, I have a Section 8 Voucher and I collect SSI and SSDI as my primary sources of income. I have nowhere to go if the uncertainty surrounding the building results in me being evicted or otherwise forced to move, which makes me extremely worried about my future. I do not want to lose my home and am really fearful that this may happen.

9. From the time I moved in, Mr. Lawrence has shown a complete lack of respect for the laws he is obligated to follow as my landlord and his unresponsive treatment that has caused me physical as well as emotional distress. His complete indifference toward his

responsibilities as my landlord shows me that he is indifferent as well and his behavior

has impacted my emotional and physical well-being.


**[Signature on following page]**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this ___27th___ of ___Sept.___ 2016

Dwight A. Sam

Printed Name -- Dwight A. Sam

# Exhibit 11

## SUPPLEMENTAL AFFIDAVIT OF ADRYENNE FURR

I, ADRYENNE FURR, hereby attest to the following:

1.     My name is **ADRYENNE FURR**.

2.     I live at 25 Orlando St. #7, Mattapan MA 02126 with my seven year old son, Sincere.

3.     I have lived at 25 Orlando St. #7, Mattapan MA 02126 since September 2015 as a tenant of
Uwa Lawrence.

4.     From the time I moved in, Mr. Lawrence has failed to repair numerous bad conditions in my
apartment that he knew or should have known about, including rat and roach infestations, a
leaky bathroom ceiling, and a broken back door. Because of Mr. Lawrence's extreme
carelessness, my son and I have experienced numerous serious health problems, including
extreme stress that is causing me to gain weight and also lose hair.

5.     The rodent problem has caused me to change my grocery shopping schedule, and has become
a huge inconvenience. I cannot leave food in my pantry for too long, because the rats will get
into it and ruin it. So what I do now is buy less food, causing me to have to go to the grocery
store every three days compared to my former routine of going once every two weeks. In
addition, the rodent issue has caused me to lose sleep.

6.     On September 20, 2016 when I was at work, Mr. Lawrence entered my home while my
mother was at home watching my son. My mother said he knocked on the door and came in
very aggressively, asked for me, then told her that if I didn't do something to "handle" the
strangers loitering in front of our building, he would file a complaint against me. He accused
me of entertaining them—I've literally never met any of those people before, and am
confused and frustrated that he's blaming me for a problem that should be his responsibility
to fix.

7.    I am also in constant fear inside my apartment because the back door to my building has a broken lock. This means that anyone can enter into the building through the back, which scares me because this is a high crime neighborhood and I am a single mother with a seven year old home at night.  I have told Lawrence's son about this condition back in April of 2016, he said he would fix the conditions, but nothing has changed. Furthermore, I know other tenants has addressed the issue and their concern about the broken lock as well.

8.    I am deeply unsettled and anxious by the uncertainty surrounding my housing. I recently just moved out of a homeless shelter with my son from Mansfield, MA last fall. I am trying to get my son settled into school and the uncertainty of where our "home" would be is causing me stress and making me lose sleep. I do not want to have to settle somewhere else because I know this would affect my child since he just got adjusted out of the homeless shelter and into a new school.

9.    From the time I moved in, Mr. Lawrence has shown a complete lack of respect for the laws he is obligated to follow as my landlord and has subjected me to abusive treatment that has caused me physical as well as emotional distress.  His refusal to pay attention to his responsibility to my son and me as our landlord has made me feel as though he is indifferent to the ways in which his behavior affects our physical and emotional health.

[Signature on following page]

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _28th_ of _September_ 2016

Printed Name -- Adryenne Furr

# Exhibit 12

## SUPPLEMENTAL AFFIDAVIT OF GERALD RICHARDSON

I, GERALD RICHARDSON, hereby attest to the following:

1.      My name is **GERALD RICHARDSON**.

2.      I live at 95 Waldeck Street #3FF with a roommate.  I have lived there since April 1, 2015 as a tenant of Uwa Lawrence.

3.      Mr. Lawrence has failed to repair numerous bad conditions in my apartment that he knew or should have known about, including a rat infestation, a broken kitchen ceiling, water damage, defective water service, broken plumbing, broken common area hallway lights, a broken window in common area of hallway, a strong odor in common area hallway, and broken doorknobs.

4.      Because of Mr. Lawrence's extreme carelessness, I have experienced numerous serious health problems, including depression.

5.      Specifically, Mr. Lawrence has not dealt with the rodent infestation since it started, which is significantly interfering with my ability to use and enjoy my apartment. On many occasions, I have to throw away food, and I always need to be conscious of where I cook. I would estimate that I throw away an amount of food roughly equal to approximately forty-percent of my weekly food stamp budget, due to contamination by mouse droppings or spoiling otherwise caused by the mouse infestation.

6.      In addition, there are numerous other problems concerning my apartment that have caused me stress and have contributed to my depression. The kitchen ceiling constantly leaks water, especially in winter.  The electricity is shut off every once in a while and typically goes off for a few hours at a time, dramatically interfering with my ability to do anything in my apartment at all.  Further, Mr. Lawrence has a lock on the water pipes and the shower in my apartment has not been working. Whenever the shower is broken, my

roommate and I have to go to other people's houses to shower, or must boil water to clean. There is also a constant odor in the hallway, consistent with people doing drugs, which Mr. Lawrence has not addressed.

7.     Mr. Lawrence has outright refused my requests to have the shower fixed, and has in fact interfered with attempts I've made to have the shower fixed on my own.  I hired a handyman to fix my shower in mid-August, and when Mr. Lawrence saw him in the building, he yelled at me, told me the handyman wasn't supposed to be in the apartment, and told the handyman to leave.  On another occasion, I tried to tell Mr. Lawrence personally about my shower and other problems, and his response was to walk away from me, get in his car, and drive off, ignoring me completely. Mr. Lawrence's conduct, including his failure to address significant problems in my apartment, has caused me to suffer serious stress and anxiety, as well as financial hardship.

8.     I am deeply unsettled and anxious by the uncertainty surrounding my housing. Specifically, it has been nearly impossible for me to find an alternative apartment, given how high the rents are currently all across Boston, I am terrified that I will become homeless if the current situation at my building doesn't get resolved soon. I do not have an alternative living arrangement lined up so I do not know what I would otherwise do for housing.

9.     From the time I moved in, Mr. Lawrence has shown a complete lack of respect for the laws he is obligated to follow as my landlord and has subjected me to abusive treatment that has caused me physical as well as emotional distress. His total indifference to his responsibilities as my landlord made me feel like he is also indifferent to how his behavior has affected my physical and emotional health.

**[Signature on following page]**

2

Signed under the pains and penalties of perjury this _____27_____ day of _SeptemBer_

20 _16_

_____

TENANT:
Gerald Richardson
ADDRESS:

95 waldeck st

3FF

# Exhibit 13

## SUPPLEMENTAL AFFIDAVIT OF CLIFTON TOWNSEND

I, CLIFTON TOWNSEND, hereby attest to the following:

1.      My name is **CLIFTON TOWNSEND**.

2.      I live at 31 Orlando St. # 6 with my 23-year-old son.  I have lived there since June 2010 as a tenant of Uwa Lawrence.

3.      Due to his extreme carelessness, Mr. Lawrence has failed to address numerous bad conditions in my apartment that he knew or should have known about, including serious infestations of mice and ants, persistent leaks in my kitchen ceiling, and repeated, persistent interruptions to my hot water service.  All of these issues have been problems since virtually the inception of my tenancy and continue to the present day.

4.      The mouse and ant infestations seriously interfere with our ability to cook and eat in the kitchen.  Ants are so rampant in my kitchen that they will frequently attack food that I have cooked out on the counter or on my kitchen table if I leave it unattended, even for a minute.  In addition, I have frequently observed mouse droppings in my pantry and on the kitchen floor.  It is extremely difficult to cook and eat in peace and quiet knowing that it is overrun by these pests, and is difficult to sleep at night on account of the movement and activity of the mice.

5.      Interruptions to my hot water service has been a serious problem in my apartment virtually since we moved in.  My hot water is currently out, and has been out since Monday, September 12, 2016—the fourth or fifth such interruption this year alone.  Whenever the hot water is out, my son and I are forced to either boil water and splash it over ourselves to bathe or go elsewhere to shower.  I usually go to my girlfriend's house in Dorchester, which is at least a thirty minute commute via public transit.

6.     In addition and possibly related to the interruptions of hot water service, are the continuance existence of plumbing issues. Mr. Lawrence had changed the toilet system and now from time to time, the toilet does not always flush or runs continuously after being flushed. When the toilet runs, it continues running for about twenty to thirty minutes, and if the toilet is flushed and runs in the evening, it keeps me up at night. On several instances, this problem has been addressed, but similar to the interruptions in hot water, has been a continuous problem since I moved in.

7.     The leaky kitchen ceiling has likewise been an issue virtually since we moved in, and has generally caused water entry into my kitchen every time it rains or snows.  I recently had to move my kitchen table across the kitchen because the leak was located directly above where my son and I used to eat meals.

8.     In addition, on several occasions Mr. Lawrence has tried to enter my apartment without advance notice and/or permission for no discernible reason other than that, as he would always say, "He's the landlord and can come in whenever he wants."  After he tried this a couple of times, I let him know it was unacceptable and that I would not be intimidated.

9.     From the time I moved in, Mr. Lawrence has shown a complete lack of respect for the laws he is obligated to follow as my landlord and has subjected me to intimidating and inconsistent treatment that has caused me physical as well as emotional distress.  His refusal to pay attention to his responsibilities as my landlord made clear to me that he was indifferent to how his actions could impact the physical and emotional health of my son and me.

**[Signature on following page]**

2

Signed under the pains and penalties of perjury this ___27th___ day of ___September___,
20_16_

TENANT: _Clifton Townsend_

ADDRESS: _31 Orchardst #6_

_Mattapan Ma 02126_

Exhibit 14

## SUPPLEMENTAL AFFIDAVIT OF TIMOTHY SMITH

I, TIMOTHY SMITH, hereby attest to the following:

1.    My name is **TIMOTHY SMITH**.

2.    I used to live at 97 Waldeck Street #1F, Dorchester MA 02124. I lived there between June 2014 and September 2016, as a tenant of Uwa Lawrence.

3.    Although I no longer reside at 97 Waldeck Street #1F, Dorchester MA 02124, the unsanitary conditions at the building have caused me a great deal of stress. In fact, I have previously been diagnosed with anxiety and depression, for which my doctor prescribes me medication, and the poor condition of the building had recently been making my mental health far worse by increasing my stress and anxiety levels.

4.    For example, while I was living there, there was an infestation of rodents located by the apartment's trash disposal which interfered with my ability to simply dispose of my trash in peace.  When I moved in, there was a metal dumpster which prevented the rats from entering. However, six months after my move, the landlord changed the disposals to plastic, 30-40 gallon garbage bins.  After this change, I began to notice the rodent infestation increasing. There was a terrible odor, and the alley way to the garbage bins were filled with trash. Every time I go to empty my trash in the disposal I worry that the rats will attack me.

5.    I lived on the first floor, and there was a hole where the ceiling had caved in over the toilet, caused by the leak in my bathroom ceiling. I cleaned it several times a day because it created puddles that a bowl or a pot could not even hold. I recently had had head surgery so I was not supposed to do anything that would be strenuous or contacting anything dirty. At night, the sound of the water dripping would cause me irritation and

made it very difficult to fall asleep.  Sometimes the water produced an odor, and sometimes the water was actually stained and discolored. This issue went on for two to three weeks, causing me stress, before Mr. Lawrence actually fixed the problem.

6.     Although I have since found new housing and moved out, Mr. Lawrence's bankruptcy added to my stress and anxiety disorder because I did not know the future of the building, and did not want to deal with the uncertainty.  I was forced to relocate, because living in this unknown state was affecting my mental health through increased stress. For a while, I did not know where I would be going next, which has added to my anxiety—although my tenancy is subsidized, the rents in Boston are increasing so rapidly it was very difficult for me to find another place to live.

**[Signature on following page]**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this ___27th___ of ___Sept,___ 2016

Printed Name -- _Timothy Smith_

Exhibit 15

## SUPPLEMENTAL AFFIDAVIT OF DAVID THOMAS

I, David Thomas, hereby attest to the following:

1.  I am the Director of Permanent Housing and Clinical Services (the "Program") for the Homeless Services Bureau of the Boston Public Health Commission.

2.  I am also a licensed independent clinical social worker. I have been licensed for twenty (20) years.

3.  The Program places two very vulnerable cohorts of the City's homeless population: chronically homeless adults with disabilities (often more than one disability), and high utilizers of emergency services into long-term housing (the "Clients").

4.  The overarching goal of the Program is to offer the stability of permanent housing so that service providers can more effectively address these mental, physical and emotional illnesses with intensive stabilization, case management services and individualized, community-based services.

5.  Relocation will undoubtedly cause severe emotional distress upon the Program's Clients, reversing the gains made by permanent housing and access to needed services. Indeed, several of the Program's Clients have already experienced severe emotional distress, precipitated in part by the debtor's chapter 11 bankruptcy filing.

6.  Specifically, one Client with multiple health issues had been homeless for over six (6) years prior to being housed at a Waldeck Street unit in May of 2014.

7.  Initially, the Client's tenancy was unremarkable during the first year and a half of housing, interrupted by multiple relapses and treatment admission. The Client would use the unit almost exclusively for sleeping.

8.  Then, beginning in December of 2015, the Client had a seven (7) month period of sobriety, during which the Client utilized in-home nursing (for medication-assisted treatment) and regularly attended community recovery meetings.

9.  The Client's overall quality of life improved as evidenced by the increased use of the home in terms of activities of daily living (cooking, hygiene) and by statements made about decreased urges to use alcohol.

10.  When the Client learned of the debtor's chapter 11 bankruptcy filing and possible foreclosure of the building in July of 2016, the Client expressed intense fears of becoming homeless again. These fears were exacerbated by the owner's sudden disappearance and unresponsiveness to the Client's requests and concerns when, previously, the owner had consistently engaged in communications related to crime prevention around the property.

11.  That same month, the Client relapsed following a seven (7) month period of sobriety. The Client was transported to the emergency room via ambulance and committed to an inpatient treatment facility.

12.  While in treatment, the Client stated that the fear of homelessness as a result of the chapter 11 bankruptcy precipitated the Client's relapse.

13.  It is more likely than not, to a reasonable degree of clinical certainty, that the landlord's actions were a substantial contributing cause to the Client's emotional distress.

14.  Similarly, another Client with multiple health conditions and a 10+ year history of homelessness, also relapsed in July of 2016 following a four (4) month period of sobriety. The Client was hospitalized twice in a one (1) month period.

15.  The Client also stated that the fear of homelessness was a precipitant to relapse.

2

Having repeatedly requested assurances that the Client would not be evicted without

any response from the owner, the Client was left to conclude that the owner had

abandoned the property and that the Client was vulnerable to homelessness again.

16.    It is more likely than not, to a reasonable degree of clinical certainty, that the

landlord's actions were a substantial contributing cause to the Client's emotional

distress.

Signed under the pains and penalties of perjury this 28th day of September, 2016.

David Thomas, LICSW
Director, Permanent Housing and Clinical Services
Boston Public Health Commission Homeless Services

3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 30th day of September 2016, I caused true and correct copies of the foregoing document to be served via ECF on all parties registered to receive ECF notices in this case, and via first class mail, postage prepaid, on the Service List attached hereto.

Dated: New York, New York
       September 30, 2016

Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

By: */s/  Christopher R. Mirick*
Christopher R. Mirick
1540 Broadway
New York, NY 10036
(212) 858-1000 (Phone)
(212) 858-1500 (Fax)
christopher.mirick@pillsburylaw.com

## SERVICE LIST

Boston Gas
300 Erie Blvd W
Syracuse, NY 13202-4201

Brookline Bank
P.O. Box 2130
Buffalo, NY 14231-2130

CSC Logic
PO Box 1518
Coppell, TX 75019-1518

CWC Capital, LLC
63 Kendrick Street, Suite 1
Needham Heights, MA 02494-2708

Chase Commercial Term Lending
P.0. Box 9176
Coppell, TX 75019-9176

Discover Bank
PO Box 3025
New Albany, OH 43054-3025

Dorothy Bowen
c/o Patricia A. Whiting, Esq.
Harvard Legal Aid Bureau
23 Everett Street
Cambridge, MA 02138-2735

Focus Receivables Management LLC
1130 North Chase Parkway STE 150
Marietta GA 30067-6429

Greentree Servicing LLC
Bankruptcy Department
P O Box 6154
Rapid City SD 57709-6154

Holbrook Coorperative Bank
95 N. Franklin Street
Holbrook, MA 02343-1595

Home Depot/CitiBank
P.O. Box 6497
Sioux Falls, SD 57117-6497

Internal Revenue Service
Centralized Insolvency Operations
PO Box 7346
Philadelphia, PA 19101-7346

JPMorgan Chase Bank, N.A.
c/o White & Williams LLP
1650 Market Street, Suite 1800
Philadelphia, PA 19103-7304

Massachusetts Department of Revenue
Bankruptcy Unit
P.O. Box 9564
Boston, MA 02114-9564

Matthew P. Fitzsimmons, Esq.
25 Mid-Tech Drive
Suite F
West Yarmouth, MA 02673-2583

Melinda Stewart
112 Water Street, Suite 203
Boston, MA 02109-4225

Monica Long
99 Waldeck Street, #1
Dorchester, MA 02124-1337

NSTAR Gas Company and
NSTAR Electric Company
Attn Legal Collections
1 NSTAR Way NW 220
Westwood MA 02090-2341

RBS Citizens
1000 Lafayette Gill
Bridgeport, CT 06604-4725

Carolyn Lewis
101 Waldeck Street #2R
Dorchester, MA 02124-1336

Dania Rosario
25 Orlando Street #1
Dorchester, MA 02126-1768

Darcell Hines
93 Waldeck Street 1F
Dorchester, MA 02124-1330

Uwagboe O. Oru-Lawrence
35 Orlando Street, Unit 6
Mattapan, MA 02126-1771

Paula R.C. Bachtell
U.S. Department of Justice
Office of the United States Trustee
John W. McCormack Post Office and
Courthouse
5 Post Office Square, Suite 1000
Boston, MA 02109-3934

Eric K. Bradford
Office of the United States Trustee
5 Post Office Square
10th Floor, Suite 1000
Boston, MA 02109-3934

David B. Chaffin
White and Williams LLP
99 Summer Street
Suite 1530
Boston, MA 02110

Ronald W. Dunbar, Jr.
197 Portland Street
5th Floor
Boston, MA 02114

John Fitzgerald
Office of the US Trustee
J.W. McCormack Post Office & Courthouse
5 Post Office Sq., 10th Fl, Suite 1000
Boston, MA 02109

William Bautista
93 Waldeck Street #1
Dorchester, MA 02124-1330

Boston Water and Sewer Commission
Jorge A. Porras, Esq.
BWCS 980 Harrison Avenue
Boston, MA 02119

Katherine R. Ward
c/o Stephen R. Whitman Esq
197 Portland Street
Boston, MA 02114

Jason Giguere
Harmon Law Offices, P.C.
P.O. Box 610389
Newton Highlands, MA 02461

John Houton
CITY OF BOSTON
ASSISTANT CORPORATON COUNSEL
CITY HALL ROOM M-5
ONE CITY HALL SQUARE
BOSTON, MA 02201

Joshua Krefetz
Krefetz, Seed & Chan
244 Brighton Avenue
Suite 105
Allston, MA 02134

Timothy M. Mauser
Law Office of Timothy Mauser, Esq.
Suite 410
10 Liberty Street
Danvers, MA 02108

Matthew J. McGowan
Salter, McGowan, Sylvia & Leonard, Inc.,
321 South Main Street
Suite 301
Providence, RI 02903

3

Joseph G. Butler
Law Office of Joseph G. Butler
355 Providence Highway
Westwood, MA 02090

Richard T. Mulligan
Harmon Law Offices, P.C.
P.O. Box 610389
Newton Highlands, MA 02461-0345


Robert Sable
Greater Boston Legal Services
197 Friend Street
Boston, MA 02114

Thomas M. Pinney
White and Williams L.L.P.
1650 Market Street
Suite 1800
Philadelphia, PA 19103


James Southard
PO Box 540540
Waltham, MA 02454

Aeneas 4 LLC
c/o George Dabney
Pangea Management Corporation
891 Centre Street, Lower Level
Jamaica Plain, MA 02130