# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re:<br><br>Uwagboe O. Oru-Lawrence,<br><br>Debtor. | : : : : : : : : : | Chapter 11<br>Case No. 13-17250-MSH |

**AFFIDAVIT OF HED EHRLICH**

I, Hed Ehrlich, hereby swear and affirm:

1.  My name is Hed Ehrlich. I am an attorney, in good standing, licensed to practice law in Massachusetts. I have been conducting research and providing legal assistance on housing related issues in Massachusetts, and prior to that in California, since 2012. My educational background includes an LL.M in law and urban studies from the Hebrew University, Jerusalem, and an LL.M. and a J.S.D. degrees from the University of California, Berkeley, where I wrote my dissertation on housing code enforcement. In California, where I lived until November 2014, I served as a legal fellow at Tenants Together, California statewide tenants' organization. I serve as a volunteer organizer at City Life / Vida Urbana ("CLVU"), a grassroots community organization in Boston since early 2015 and a volunteer attorney at Greater Boston Legal Services since July 2016.

2.  At CLVU, I am the lead organizer of the properties owned by Uwa Lawrence ("Mr. Lawrence," or "the Landlord"), located at 91-101 Waldeck Street, Dorchester MA 02124

and at 25-35 Orlando Street, Mattapan, MA 02126. CLVU work with tenants in these buildings ("Tenants") began in April 2016, when several Tenants called CLVU offices or came to weekly meetings reporting harassment by the landlord. CLVU organizers began intensively canvassing and organizing the Tenants in late June 2016, after learning of Mr. Lawrence's bankruptcy. Since I began working with the Tenants, in June 2016, I have spent many hours in these properties, working closely with the Tenants, their case workers, housing subsidy providers, and advocates. As an organizer, I have spent many hours in conversations with the Tenants discussing their housing situation.

3. My work in these properties exposed me to the multiple substandard conditions in the buildings which include vermin infestations; irregular water, gas, and electricity services; broken laundry services; broken doors and windows; and harassment by the Landlord, to name a few. I have been to many buildings where bad housing conditions exist, but the conditions in the Waldeck and Orlando properties are some of the worst I have ever seen.

4. The tenants are well aware of the conditions in the buildings which affect their physical health, mental stability, and sense of safety, and have tried many times to advocate for themselves. For example, in the case of 25 Orlando Street, a group of Tenants formed a tenant association even before CLVU began its organizing efforts in the building. The association collected tenants' signatures on a petition to the Landlord asking him to fix the multiple problems in the building. According to the Tenants, Mr. Lawrence tore their petition to shreds, and later moved to serve some of the tenants who signed the petition with an eviction notice. These tenants later approached CLVU asking for assistance.

5. On multiple occasions, tenants shared with me their desire to move out to a different apartment. The main reason they state for not moving out is the lack of any alternative apartment they can afford, using a housing voucher.

6. The tight housing market in Boston also led landlords in the city to use strict—and often discriminatory—tenant screening. The Tenants are members of groups most susceptible to housing discrimination; many of whom are people of color, disabled, single-mothers, recipients of housing subsidies, or with criminal history. For example, one tenant, a man in his late 50's is a disabled veteran with a felony conviction. After serving his sentence he was trying to move on with his life, but landlords' discrimination against people with criminal background left him homeless for about a year. He was finally able to secure a home as a tenant of Mr. Lawrence, which provided him with the necessary minimum stability; he is currently a student at a community college and one the Tenant's association most active leaders. That tenant was willing to suffer abuse from Mr. Lawrence, who moved him from one apartment to another and provided him with substandard housing, knowing from his own experience that the only other alternative is becoming homeless once again.

7. Indeed, for many tenants, if forced to move out of their apartment, the alternative is a homeless shelter. For example, one tenant who I first met when she was pregnant, is a single mother of two—a two years old daughter and a newborn. She had suffered repeated abuse from Mr. Lawrence, including taking away her kitchen appliances and breaking into her room and destroying her bed and other belongings. She eventually felt forced to move out, but without family support or alternative affordable housing options, she currently lives in a homeless shelter.

3

8. Beds in homeless shelters in Boston are scarce. Authorities prioritize families with children, and single adults are unlikely to be admitted to a homeless shelter. Many Tenants had experienced homelessness before and are well familiar with this reality. For example, one tenant, elderly African-American woman was homeless for three years after separating from her husband and then moved from a homeless shelter to a rooming house, before finally receiving a mobile Section 8 housing voucher and finding an apartment at the Orlando Street property. Ever since she moved in and because of conditions prevailing there, her health has deteriorated but with her housing history and health conditions, she feels she has no practical alternative.

9. The above mentioned examples are representative of Waldeck and Orlando properties' tenants. To the best of my knowledge, of the 59 units in these properties, at least 21 are home to tenants who were homeless at some point their lives. This number might be even higher as many of them feel ashamed or embarrassed by their homelessness and will not readily share such experience; others might not consider their previous unstable housing situation—staying with a friend, doubling-up with a relative, or remaining in an unhealthy relationship—as homelessness. In addition, at least 42 of the tenants are people of color; 9 are single mothers to minor children; 2 are single mothers to adult disabled children; 5 have prior felony convictions; and to the best of my knowledge, at least 49 of the Tenants receive a housing subsidy.

10. It is therefore my conviction that the tenants living in Orlando and Waldeck properties are some of the most vulnerable residents of the City of Boston. They are willing to live in deplorable housing conditions only because the alternative is an even grimmer reality. For the Tenants, losing their current homes would mean either displacement from their

4

community where they now receive support and services, or homelessness. On the other hand, the preservation of this housing by a non-profit with a commitment to improving the conditions and not displacing the Tenants would be immeasurably valuable to the Tenants.

Signed under the pains and penalties of perjury this 28 day of September, 2016,

_____
Hed Ehrlich
(BBO# 601134)